[Civ. Nos. 14297, 14626.   First Dist., Div. One.   Feb. 19, 1951.]

W. K. POPE, Appellant, v. GRACE SHIELDS POPE, Respondent.

J. W. Lenahan for Appellant.

John D. Costello and M. Mitchell Bourquin for Respondent.

BRAY, J.—Consolidated appeals by plaintiff from those portions of both interlocutory and final judgments apportioning the community property and providing support and maintenance for defendant. No appeal is made from granting of a divorce to defendant.

## QUESTIONS PRESENTED

1. The main contention is that the evidence does not support the findings as to community property. 2. Should the

judgment have defined the items of community property?
3. Can an interlocutory decree make a present award? 4. Is
the alimony excessive?

### RECORD

Plaintiff filed suit for divorce on the ground of cruelty.
Defendant cross-complained for separate maintenance, later
amending her cross-complaint to one for divorce on the
grounds of cruelty, habitual intemperance and desertion. A
strongly contested trial was had. The court made findings here-
after discussed. The interlocutory decree granted defendant
a divorce on the grounds of cruelty and habitual intemperance
(although the court also had found the allegation of desertion
true). It awarded defendant $3,072.12 costs of suit, $2,000
per month alimony terminable only on defendant's death
or remarriage, and the sum of $100,000 in lieu of a specific
allocation of any community property, $50,000 to be paid
forthwith, and gave plaintiff the option of paying the balance
in installments. While the appeal from the interlocutory
decree was pending, a final decree was entered, incorporating
the terms of the interlocutory decree.

### FINDINGS

The court's findings as to the community property and
alimony follow: There is community property "of a value
in excess of $150,000.00, exclusive of sundry household fur-
niture, equipment and incidentals to the same, including
objets d'art, which the Court also finds to be community
property." ". . . it will be more consonant with the inter-
ests of justice to award" defendant a cash judgment in lieu
of apportioning specific shares in the community property;
that because of plaintiff's cruelty defendant is entitled to
substantially more than half of the community property, and
$100,000 will constitute a "just and proper division of the
value of any community property, or funds inuring to the
credit of the parties . . ." Plaintiff is worth in excess of
$1,700,000, consisting of moneys in the bank, real property
in San Francisco worth in excess of $500,000, a one-sixth
interest in El Dorado County realty of an approximate value
of $40,000, a one-third interest in household furniture and
equipment in that county of an approximate value of $7,000,
a one-third interest in other property in that county and in
Monterey County, value undisclosed; a beneficial interest
in certain trust funds, present value $600,000, stocks, bonds
and other securities valued in excess of $547,000, an auto-

mobile worth approximately $2,000, and other personal property, value undisclosed; "all of the foregoing comprising both his separate property and the community property of" plaintiff and defendant. Plaintiff's total income for the year 1947 was in excess of $90,000, and for the year 1948 will exceed $105,000. During the marriage the parties lived upon a standard of luxury compatible with plaintiff's present wealth. Defendant, 50 years of age, is unskilled in any remunerative occupation, and not possessed of any income, and requires that plaintiff pay her $2,000 per month for her support so that she may live in the manner and condition to which she has been accustomed. Sundry household furniture, equipment, and objets d'art are community property and awarded to defendant, excepting certain personal property of plaintiff hereafter mentioned. A method of arbitration is set up in the findings to determine what these items are in the event the parties cannot agree. Improved real property at Palm Springs is the separate property of defendant.

## LAW APPLICABLE

In determining the sufficiency of the evidence to support the findings as to community property, certain well established rules of law must be borne in mind: (1) If there is a conflict in the evidence this court must accept the evidence and the reasonable inferences therefrom most favorable to the court's findings. (2) The evidence here shows that all income received by plaintiff from all sources including separate property was commingled and all records thereof were under the control of plaintiff. Presumptively all income and property received by the husband after marriage is community property and the burden is on the husband to show that it is separate property.

## GENERAL FACTS

The parties were married September 16, 1934, and had one separation for a short period in 1946 when defendant brought a suit for separate maintenance. They were reconciled and lived together until July, 1947. The total period elapsing between marriage and the final separation was almost 13 years. At all times they lived in the style of wealthy persons. For approximately the first five months of their marriage, they lived at the Cathedral Apartments in San Francisco. They moved to a suite of five rooms in Stanford Court until plaintiff purchased a 14-room house in Burlingame. In 1942 he

was transferred by his employer (Pope & Talbot, Inc.) to Los Angeles where they lived in a four-room bungalow of the Beverly Hills Hotel. About five years later they returned to San Francisco and lived at the Mark Hopkins Hotel. There were no children. At the time of trial plaintiff was 48 years of age, defendant 50. Plaintiff's father was wealthy. Plaintiff was employed by his father's firm except for approximately six months when he was required by his employer, because of his drinking, to take a leave of absence. In 1931 he received from his father 43 shares of Pope Estate Company stock. Part of this stock was resold to Pope, Sr., prior to the marriage. Plaintiff testified that there were simultaneous transfers to plaintiff's brother and sister. However, Satchel, the accountant for Pope, Sr., stated that 16 shares were given (apparently to the others) at the time the 43 were transferred to plaintiff. Whether this meant 16 shares each, or altogether, does not appear. In 1947 plaintiff's accountant destroyed all tax returns for the years prior to 1942. This was after defendant had dismissed her Los Angeles action for separate maintenance in which the question of community property had been raised. The evidence for the years 1934 to 1942, especially the period 1934 to 1937, is extremely sketchy. Plaintiff testified that at the time of marriage (1934) he was employed by Pope Estate Company (the *alter ego* of his father). Later he said he did not go to work for it until 1937. He gave no testimony concerning his earnings, if any, in the years 1934-5-6 but claims he lost $14,000 in the Pope Sherwin Company of which he says he was a "figurehead." He further claims that his salary was $2,400 in 1937, gradually increasing to $16,500 in 1945, dropping to $12,000 in 1946, and to $7,585 in 1947 (he worked only a portion of the year, having been required because of his drinking to take a leave of absence) totalling for the years 1937 through 1947, $95,125. The parties in the years 1942-1947 made split income tax returns, defendant's returns showing income of $6,407.50 in 1942, reaching $8,330 in 1945 and dropping to $3,792.50 in 1947. For the same years plaintiff showed a gross income of $29,524 in 1942, reaching $92,242 in 1947. From 1936-1942 plaintiff paid defendant a monthly allowance of $800, out of which she paid the household bills. While at Beverly Hills he paid her $525 per month and apparently paid the cost of living bills.

The Pope Estate Company was dissolved in 1941 and plaintiff was then employed by Pope and Talbot, of which his brother was president. In 1942 he was vice-president and southwestern manager. The bulk of plaintiff's income from all sources was deposited in a commercial account in his name in the Bank of California. This included money received from earnings, dividends, allowances from his family, trust income, and from sales. The allowances to defendant, the family expenses, personal expenses and moneys for purchase of stocks came out of this account. The deposits and withdrawals and year end balances for the designated years were:

| Year | Deposits | Withdrawn | Year end Balance |
|------|----------|-----------|------------------|
| 1942 | $62,224 | $37,246 | $31,648 |
| 1943 | 64,853 | 66,100 | 31,246 |
| 1944 | 46,351 | 67,457 | 10,120 |
| 1945 | 100,389 | 65,486 | 45,022 |
| 1946 | 96,135 | 117,718 | 23,439 |
| 1947* | 62,998 | 77,788 | |

(*First eight months)

Total deposits: $432,950

When living at Beverly Hills plaintiff had an account with the Security First National Bank which was opened with a deposit of $400 or $500 and which it was claimed never had a credit balance of over $1,000. What moneys were deposited in this account and what the withdrawals were do not appear. An account which plaintiff called the "household account" was opened in the Crocker Bank. The deposits in 1946 were $22,111 and withdrawals $20,507; in 1947, $17,431 and $17,653; total deposits, $39,542. Thus in the years 1942 to 1947 the total deposits in the two banks were $472,492. This computation does not include an account, entitled "personal account," with the Crocker Bank in which in the year 1946 plaintiff deposited $40,340.77. Plaintiff failed entirely to explain this account, claiming the bank's record of this account was "false." Nor does it include the sum of $5,000 yet remaining in the "agency account" hereafter discussed.

Defendant had no gainful occupation and no earnings, and made no financial contributions to the community.

Plaintiff's testimony as to his salary and other income was unsatisfactory. He stated his salary for 1942 variously as $27,000 and $2,700 a month. The records of the employing companies were not produced, nor was any testimony given

as to salary except by plaintiff. He did not produce, on request, records of his bank accounts prior to 1941. Plaintiff did not attempt to identify the various in and out items of his bank account, contenting himself, with a few exceptions, with showing the property which came to him from his father and the estates of his father, mother and aunt. The parents were not too friendly toward defendant, except in later years.

COMMUNITY PROPERTY

■ While the findings do not show how the court arrived at its determination that the community property is of a value in excess of $150,000, the evidence supports as a reasonable and possible method the following: The total deposits for the period January 1942-August 31, 1947, were $472,492; plaintiff's traceable separate income for that period was $185,966.45; balance creditable to community, $286,525.55. It must be remembered in this behalf that because of the failure of plaintiff to account for the income prior to 1942, all of which was under his control, or to prove the source of the money which purchased the stocks and bonds plaintiff now owns (other than those in his father's companies) the court was entitled to assume that they are community property. The traceable separate income referred to above is comprised of the following items:

```
1942, 1935 trust ...........................$15,000
1943    "    "    ...........................  15,000
1944    "    "    ...........................  15,000
1945    "    "    ...........................  15,000
1945, Testamentary trust
        March-December at $1,250 per month.....  12,000
1945, Quarterly dividends
        August and December on 30,375 shares...   8,000
1946, 1935 trust ...........................  15,000
        Testamentary trust ....................  15,000
        Dividends on 60,477 shares.............  32,000
1947, to August 31: 2/3rds of income for 1946..  41,332
                                                 ───────
                                                 $183,332
1947, Cash distributed
        final distribution of father's estate......   2,634.45

Total credited to September inclusive.........$185,966.45
```

Plaintiff contends that in this computation there are six errors which require certain sums to be credited to separate

income and added to the total above mentioned and deducted from the total income. We will consider them seriatim.

1. Plaintiff received from his mother's estate $25,363. However, as this was not received until 1948, it is not included in the $472,492 income figure and hence should not be deducted.

2. In a ratable distribution of his mother's estate in 1945 plaintiff received one-third of her jewelry. This third was appraised in the estate at $40,650. Plaintiff contends that this jewelry was sold by the bank and that he was given the cash proceeds therefrom, and that the sum of $40,650 should be added to the separate income. The trouble with this contention is that there is no evidence for what amount the jewelry was sold, and whether any proceeds therefrom actually went into the figure of $472,492. The only testimony on the subject is that of the trust officer of the Crocker Bank who stated that at the time of distribution, "It was lodged with us and it was eventually sold, except one piece we have, a necklace. He took some pieces." He was then asked and testified to its appraised value in the estate, and stated that plaintiff "got the proceeds of the sale in lieu of the jewelry." This is certainly insufficient evidence to show how much jewelry was sold, what it brought, or what became of the proceeds. Plaintiff had it in his power to account for this and failed to do so.

3. From the estate of his aunt who died in 1922, plaintiff received a one-third interest in real property at Van Ness and Pacific. Plaintiff testified that he derives $166 a month income from it (apparently this was at the time of trial in 1948). The only other testimony on the subject is that of the real estate broker, Dempsey, who testified the lease expires in 1951, then having two years plus to run. There is no showing whether plaintiff had received income from this property for any length of time prior to the trial, nor what became of that income, if he had received any,—other than plaintiff's general statement that he put all income in the bank account. In view of plaintiff's failure expressly to show these matters, a reasonable inference could be drawn that the $472,492 did not include very much, if any, of it. On this evidence, to credit, as plaintiff would now have done, his separate income with six years at $2,000 per year, would require the court to base such calculation on guesswork.

4. In 1941 plaintiff sold to his father for $32,375, 185 shares of Pope Estate Company, which he claimed was the balance remaining from an original gift, before marriage, from his father of 43 shares and the stock dividend thereon. It is claimed that on December 3, 1941, this sum went into his commercial account, remaining there until January 28, 1944, when he opened an account in the Bank of California to speculate in securities. He contends that later he sold some of these securities for $3,000 over their purchase price of $28,366 and deposited this $31,366 in the commercial account. He contends that both the $32,375 and the $31,366 should be deducted from the commercial account. These two contentions depend primarily upon the question of whether the 185 shares were separate or community property. In 1931, prior to marriage, plaintiff received from his father 43 shares of Pope Estate Company. In 1932 he sold one share to his father for $2,500. In March, 1933, he sold him seven shares, and in November two, all at $2,000 per share. In 1935, after marriage, plaintiff received 402 additional shares. In 1935 he sold his father 250 shares, leaving as balance the 185 shares in question. Plaintiff testified that at the time of marriage he was employed by the Pope Estate Company. Later he stated that his father would give him an allowance, and gifts to do a few things he wanted. Defendant testified that plaintiff told her his father had given him many stocks ''instead of salary.'' The other stocks from the father during this period were accounted for, and hence it is a reasonable inference that the original stock given before marriage and the dividend given after marriage, were given in place of salary.

The opposition of plaintiff's parents to the marriage during its early years, the fact that the Pope enterprises were the *alter ego* of plaintiff's father, the fact that shortly after the marriage the father and mother arranged to sell certain property to the company for an agreed consideration which included distribution of 402.6 shares to plaintiff in addition to the 33 he retained from the 1931 transfer, plus the fact that almost immediately he resold a large part to his father and then the balance to him in 1941, all pursuant to a repurchase plan of the father, plaintiff's statements that in 1935 his father gave him gifts, including stock, in the nature of salary, together with the failure to produce the books of the Pope enterprises, and all the other circumstances of the

case, support the trial court's community property findings. A reasonable inference can be drawn that the stock dividend was a device by which plaintiff could be compensated without enhancing the community.

"The rule is well settled that where the facts established are such as to reasonably permit opposing inferences to be drawn therefrom and the trial court has adopted one and rejected the other, an appellate court will not disturb the finding." (*Baylis* v. *Baylis,* 48 Cal.App.2d 674, 679 [120 P.2d 89].) Moreover, the $32,375 is not shown to be within the $472,492. The former sum was deposited in the commercial account on December 3, 1941, which was prior to the period included in the latter figure. Nor is there any evidence that it was included in the figure of $62,224 shown as deposits for the year 1942. Plaintiff testified that he left it in there and did not take it out until he bought securities later. However, the bank account for 1942 fails to support his statement. The situation is very confusing. As pointed out above, the $32,375 was deposited in the commercial account December 3, 1941, but was not there in 1942. The agency account, the one in which plaintiff claims he deposited that sum after withdrawal from his commercial account, actually was not opened until January 28, 1944, and then with plaintiff's personal check for $16,000, a cashier's check payable to plaintiff in the sum of $4,000, and the proceeds of a $10,000 United States Savings Bond. The evidence supports the conclusion that the $32,375 had nothing to do with the stock purchased from this account. As the moneys going into the agency account have not been identified as plaintiff's separate property, there is no reason why the proceeds of the stock purchased from that account should be assumed to be separate property.

5. Plaintiff contends that other dividends from the 1935 trust and the testamentary trust mentioned in the foregoing table of credits to separate income, were paid in addition to the sums shown in the table. However, plaintiff points to no evidence of the payment of such dividends, their amounts or their going into plaintiff's bank account. This is a typical example of the position taken by plaintiff in the case. He contends, in effect, that as he was the recipient of separate income, it was incumbent on the defendant to prove that none of the moneys in the commercial account came from this income. Actually the burden was on plaintiff to show that they did come from his separate income, and having failed

to do so, neither the trial court nor this court can guess about it. In such event, the presumption of community character must prevail. Plaintiff testified that his interests from these trusts was $30,000 per year, which is the amount shown in the foregoing table. During the trial defendant testified that in 1946 a dinner companion told her that he had received "a terrific check for Pope & Talbot [stock], an extra dividend" and then went on to say that plaintiff must have received such a dividend likewise; that he figured it must be approximately $50,000 and that plaintiff would receive another one in six months, making $100,000 in one year. There is no evidence that plaintiff did receive such dividends. The dividend books of Pope and Talbot were not produced, although plaintiff's brother is the president of that corporation, nor were such items identified anywhere in the bank accounts. This testimony was elicited from defendant in response to her testimony on direct examination to the effect that the only time she had ever asked plaintiff for money was once when she heard he had received $50,000 in dividends. On cross-examination, plaintiff asked about the conversation in which she had heard this, and the foregoing was brought out. Now, plaintiff contends that because of this more or less idle dinner chatter, this court should assume that in 1946 plaintiff received $100,000 in dividends from the Pope & Talbot stock, and that it was deposited in the commercial account, which fails to show any such deposit.

6. Plaintiff contends that the sum of $134,872 should be deducted from the balance of $286,525.55 for items paid subsequent to July, 1947, for maintenance and support, attorneys' fees and costs of defendant. Included is a sum of $65,300 for separate maintenance, attorneys' fees and costs of plaintiff himself. It is difficult to understand the theory on which this latter item should be considered. However, the entire total cannot be considered as it was expended after the accounting period considered by the trial court. As the income for the subsequent period is not included, the charges for that period should not be included. It appears from the evidence that plaintiff's total income for the year 1947 exceeded $90,000 and for 1948 would exceed $105,000. The tabulations here included only the first eight months of 1947 and none of 1948. The evidence also shows that not all of the 1947 or 1948 income would be separate property. Therefore, it is reasonable to charge these later expenditures

to the community income of these later years, rather than to that preceding August, 1947.

The $286,525.55 balance creditable to community hereinbefore mentioned is without any deduction for allowances to defendant (which for a great portion of the marriage was $800 per month), household and personal expenses. Mr. Dupont, assistant secretary of Pope and Talbot, produced a large number of checks which he said were for plaintiff's personal expenses for the years 1942-1947. At least, he had concluded from his examination of them that that is what they were. Plaintiff did not testify concerning them. No detailed explanation of them was given by Dupont. While the checks produced totalled $142,907, among them were checks payable to cash totalling $19,120.93 for which no explanation was offered. The balance left as possible community expenditure is $123,786.07. In using this sum we are assuming, without more evidence than the mere conclusion of Mr. Dupont, who, apparently, from his testimony, determined these questions merely by an inspection of the checks, that all the items in it went for defendant's allowance, household expenses, etc. Deducting this sum, $123,786.07 from the balance of $286,525.55 leaves a net balance of $162,739.48 as income not shown to be separate property and hence must be regarded as community property.

Plaintiff contends that an item of $15,942 for income taxes during the period 1942-1947 should be deducted. Deducting it from the last balance of $162,739.48 leaves $146,797.48, approximately the amount found by the court, and well over the division awarded defendant. The court, of course, had the power to award defendant all of the community property.

### $60,000 LOAN

Plaintiff borrowed $60,000 from the Crocker Bank, putting up Pope and Talbot stock as security, depositing it in a special account, withdrawing $53,000 of it the same day to use in a trade with his brother for certain property. None of this money ever went into the commercial account, nor is included in the table used here. Hence, in spite of plaintiff's contention that the $60,000 should be deducted from the $472,492, it is obvious that it should not. Moreover, the loan was paid by checks drawn on the commercial account. What part of the repayment came from community and what part from separate moneys in the commercial account,

it is impossible to say. Presumably some of it did, but no allowance for it has been made. It would be included in the court's finding that the community property was "in excess of" $150,000.

## STOCK IN LIEU OF SALARY

As pointed out before, there is sufficient evidence to support the court's finding that plaintiff received stock in lieu of salary and that the $32,375 which he received from the sale of stock in 1941 was community property. Adding this sum to the last balance of $146,797.48 equals $179,172.48.

Plaintiff contends now that in arriving at the gross deposits of plaintiff there were duplications in that plaintiff withdrew moneys so as to have a small balance in the bank at the tax period and then later redeposited the same amount. However, no specific amounts were traced in and out this way. When asked concerning specific withdrawals in late February, 1946, and the purpose of their withdrawal, plaintiff said he could not recall. Again, when asked if in each year he removed moneys from the bank between the 25th and 27th of February in each year and made enormous deposits in the first week of March he said, "It was probably done for tax reasons. I *can't recall.*" (Emphasis added.) In view of the uncertainty of plaintiff on this subject and the unreliability of his testimony as to his finances as a whole, it is impossible to determine from the evidence the nature and extent of these redeposits. Plaintiff's evasiveness and lack of recollection of his financial affairs throughout the trial could be explained by the possibility that by no means did all of his income go into the bank accounts which he produced.

In considering plaintiff's claim that there was no community property, the court had the right to take into consideration the fact that when the parties separated in July, 1947, plaintiff offered her the sum of $50,000 cash and $50,000 to be paid in 1960, and $1,500 per month support. While plaintiff contended that this was merely an offer of settlement to keep from going to court, the circumstances of the offer were such that an inference could reasonably be drawn from it that it was an admission that her community property interest was worth that much, at least.

As said in *Falk* v. *Falk*, 48 Cal.App.2d 762, 767 [120 P.2d 714] : "Pursuant to section 164 of the Civil Code, the presumption exists that property acquired by either of the spouses

during the marriage is community property, and this presumption may be rebutted only by satisfactory proof to the contrary. . . . The burden is upon the one who controverts the presumption to prove his claim regarding the character of property acquired during the marriage. Unless that contention is supported by satisfactory proof, the trial court is bound to decide the controversy in accordance with the presumption. . . .

"The commingling of separate property, or the proceeds therefrom, with community property or funds in such a manner as to make it impossible to identify the separate property or to trace the source of the separate funds renders the entire fund or property community in its nature, unless the community funds are inconsiderable in amount. When it is impossible to trace the source of commingled funds, the presumption that all property which is acquired during the marriage is community, will be controlling."

Under the evidence in this case, although the separate property was considerable, still the community funds were not inconsiderable in amount. It is true that the community expenses were high but it is impossible to tell from the evidence in the case that, as contended by plaintiff, they, month by month, exhausted the community contribution or required contribution from separate resources.

In *Grolemund* v. *Cafferata*, 17 Cal.2d 679 [111 P.2d 641], the court said (p. 683): "As to the blending of separate and community property, the general rule is that the confusion of these, so that each is indistinguishable from the other, renders the mass community property for the reason that the separate owner is not able to establish his separate right to any article of the mass, nor prove his right to a computable share of it . . ." The situation in our case is, that while plaintiff received certain properties from the estates of his relatives, which properties undoubtedly are his separate property, he blended income therefrom with his salary, both that paid in cash and in stocks, and with other income, the source of which he made no effort to disclose.

"Where the handling of the community funds is entrusted by law to the husband, a certain amount of precaution devolves upon him to keep an approximately accurate account of their disbursements and to keep segregated the community and the separate funds of the parties or to take the legal consequences of being unable satisfactorily to account therefor." (*White* v. *White*, 26 Cal.App.2d 524, 529 [79 P.2d 759].)

"Appellant also claims that neither the separate property of the husband nor wife can be charged with any community rights and that the courts have no jurisdiction to apportion or to set aside to either party any part of the other's separate property. With this respondent has no quarrel, but contends that where appellant has been found to have community property in his possession which he fails or refuses to disclose, a personal judgment against him for one-half of the amount of such community funds is not a division of a separate estate, but merely a division of the community funds which the court has found to be in existence but withheld." (*White* v. *White, supra,* p. 532.)

"The burden of producing clear and satisfactory proof that the property was the separate property of decedent was upon the contestant as the respondent was entitled to rely upon the presumption that it was community property." (*Estate of Duncan,* 9 Cal.2d 207, 217 [70 P.2d 174].)

Plaintiff's testimony as to his income was unreliable. He seemed to have no definite idea of what his income was, or the value of his properties, and was vague on most of his financial affairs. Many items of income he made no effort to identify. For example, on March 7, 1944, he deposited in the so-called agency account $9,620, the proceeds of a sale of a $10,000 United States Bond. No attempt was made to account for the source of that bond. There were many unexplained matters. Thus, the assistant secretary introduced in evidence checks for "personal expenses" totalling in the year 1942 $73,137.80; yet the commercial account for that year shows only $37,246 withdrawn. For the year 1945 plaintiff received $16,500 salary, $15,000 from the 1935 inter vivos trust, $8,000 dividends from inherited stock, and possibly received $15,000 from his father's testamentary trust. (It is not clear that he did.) This totals $54,500. Yet that year there was over $76,000 reported as taxable income, and over $100,000 actually deposited in the commercial account. In 1943 his shown income was a possible $29,500. His commercial account shows $64,853. He testified that Satchel was his accountant and had handled his personal books for the past 10 years. Satchel, however, testified that he had kept no personal books for plaintiff prior to 1948, and that there never were any books. Satchel was the accountant for plaintiff's father over this period and made out plaintiff's income tax reports. No record of moneys paid plaintiff by any of his father's com-

panies was produced. Although the assistant secretary of the Pope enterprises testified to some of plaintiff's withdrawals from his personal bank account, he was not asked about plaintiff's income. Plaintiff's cancelled checks were kept by the secretary of the assistant secretary of the Pope enterprises. As shown heretofore, the only evidence of the community expenses was that given by the assistant secretary in which he assumed from an examination of certain cancelled checks that they were plaintiff's "personal expenses." No attempt was made to show which were for separate and which for community purposes.

The witness Satchel produced plaintiff's income tax returns for the years 1942-1947. They offer very little light, if any, on the community property question. It is impossible to reconcile the figures in them with the bank accounts. It is also impossible to reconcile the claimed total separate and community income with these returns or with the bank accounts.

Plaintiff contends vigorously that the net community contribution monthly was zero and therefore there never was any community component of the bank account. This contention is based on the assumption that the only community income was the amounts which plaintiff testified that he received as salary. If this were all the community income, obviously the allowance to defendant and the cost of operating the household either at home in their apartment or hotel would wipe it out. But the assumption, as shown herein, is wrong.

### SALE OF RESIDENCE

In 1935 a home was purchased in Burlingame for $19,500 paid by check on the commercial account. Improvements cost $4,500. (Plaintiff first testified they cost $2,500 and later changed it to the former figure.) Plaintiff at first testified that the purchase price came from $25,000 for which in 1935 he sold one share of stock to his father. Later he said he sold the stock for $2,500. Obviously the purchase price did not come from this source. In 1942 the property was leased to Hearst by a lease signed by *both* plaintiff and defendant. When the home was sold, the deed was executed by both parties as grantors. (Apparently the title company required this, regardless of its status.) Defendant testified that plaintiff often spoke of the house as "our home" and in a discussion concerning its being sold she said, "If we do sell it, let's put the money in the bank and buy another home," to which

plaintiff agreed. The instructions to the title company were that the sale price should be paid to both parties. Check in the sum of $20,021.15 in payment of the house was deposited in the Wells Fargo Bank to the credit of both parties. With interest, that deposit now amounts to around $23,000. The foregoing résumé of the evidence concerning the house is a substantial basis for holding that the house was community property. (See *Turknette* v. *Turknette*, 100 Cal.App.2d 271 [223 P.2d 495].) The $23,000 should be added to the last balance of $179,172.48, making a new balance of $202,172.48.

### FURNITURE (FIRE LOSS)

Defendant testified that before marriage she had furniture for five rooms at the Stanford Court Apartments and ''a great deal'' stored, all valued around $12,000. After marriage this furniture was used by the parties, was added to by other furniture which defendant claims to have paid for from sale of her jewelry. Defendant sold some of the furniture and replaced it from the proceeds of sale.

It is impossible to determine from the evidence to what extent plaintiff contributed to the acquisitions to the furniture either directly or by way of gifts to him or to both parties from his parents. When they moved from Burlingame to Los Angeles the furniture was stored. In late 1948 a fire occurred in the storage warehouse. The loss has been valued at $11,105.29, and a check for that is being held by the insurance company to await the outcome of this action.

While the court made no specific finding concerning this $11,105.29, it did find that all of the furniture and furnishings (except certain items which will be later discussed) were community property. The evidence supports such a conclusion. The proceeds of the burned furniture are in the same category. Adding this $11,105.29 to the last balance of $202,172.48 makes $213,277.77 as the minimum total of community property. From this total should be deducted $16,000 which represents the redeposit in the commercial account of funds drawn therefrom for the agency account. This leaves a balance of $197,277.77.

The $32,375 received from sale of stock, which stock was in lieu of salary, was deposited in the commercial account in December, 1941. It was received so close to the accounting period which because of plaintiff's failure to produce the records starts January 1, 1942, as to be reasonably chargeable to that period. However, it might be claimed that it should

be credited as against expenditures of 1941 instead. If this were done, and the sum were deducted from the minimum total of community property last mentioned, the balance would still be in excess of the $150,000 which the court found.

### FURNITURE, ETC. (PLAINTIFF'S PROPERTY)

The court found: "There is sundry household furniture, equipment and incidentals to the same, including objets d'art, which the Court concludes is the community property of the parties to this action, and the Court awards all of the same to GRACE S. POPE, save and except such items as may be determined to be personal possessions, personal clothing, or articles of personal adornment belonging to W. K. POPE . . ." It then appointed the attorneys for the respective parties to determine the articles belonging to plaintiff in the event that the parties could not agree. At argument we requested that counsel try to agree on what the items belonging to plaintiff were. They have been unable to do so. Defendant conceded at the trial that certain items belonged to plaintiff. Plaintiff introduced in evidence (plaintiff's exhibit 27) a list of items consisting of seven pages on which he had written "mother" or "father," "sister" or "brother" as their source and which he claimed were given to him and which he, in turn, had never given to defendant. It is impossible to tell from the record whether the court meant by its statement in the finding "personal possessions, personal clothing, or articles of personal adornment belonging to" plaintiff any of these items, or if the court meant to include any but the very few items which defendant admitted belonged to him. In the interlocutory decree the court did not insert the arbitration clause or the exception of any items for plaintiff. It awarded to her all the personal property "presently in her possession." The case will have to be remanded to permit the court to determine what this phrase meant and what personal property it intended to except as the property of plaintiff.

### ALIMONY

Plaintiff complains of the $2,000 per month alimony. His main charge against it is that in 1948 while living separately at the Beverly Hills Hotel defendant's bills ran only about $544 for board and room. This, of course, only included her hotel bills, but none of the other expenses of a woman who for more than 12 years of married life had been accustomed to live in high luxury. She testified that at the

time of her marriage she was living in the Stanford Court Apartments and was worth the sum of $44,900, including moneys, automobile, stocks and bonds, and jewelry, and that she had an income of $400 per month. At the time of the decree she was in poor health. All she had left was about $5,000 in the bank, no automobile, jewelry worth $20,000, and an equity in a small house in Palm Springs purchased with money borrowed from her daughter. The court found that she is 50 years of age, unskilled in any remunerative occupation, without income, and that $2,000 was reasonably necessary to enable her to live in the manner and condition to which she has become accustomed. The evidence shows that during the separate maintenance action and during the pendency of this action plaintiff consented to paying her $1,500 per month support. Having in mind that approximately 30 per cent of the alimony will go to payment of income taxes, we cannot say that the court abused its discretion.

■ Section 139 of the Civil Code provides that the court may compel the husband to make "suitable allowance" for the wife, "having regard to the circumstances of the parties respectively . . ." Such suitable allowance is a matter for the determination of the court, having in mind those circumstances. (*Barham* v. *Barham*, 33 Cal.2d 416 [202 P. 2d 289].) "A woman past middle age can seldom rehabilitate herself after a break in marriage relations and the courts may properly safeguard her financial future where the marriage is dissolved for the offense of the husband." (*Arnold* v. *Arnold*, 76 Cal. App.2d 877, 886 [174 P.2d 674].) The amount of support the husband must pay is within the discretion of the trial court. (*Bowman* v. *Bowman*, 29 Cal.2d 808 [178 P.2d 751, 170 A.L.R. 246].)

### INTERLOCUTORY DECREE

■ The interlocutory decree awarded defendant in lieu of her community property interest $100,000, $50,000 of which was to be paid forthwith as of the date of the entry of the decree. Plaintiff contends it was prejudicial error "to make a present and absolute disposition in the interlocutory" decree. (*Wilson* v. *Wilson*, 76 Cal.App.2d 119, 132 [172 P.2d 568].) Assuming this to be true, the matter is entirely moot. The payment was not made, the final decree has been entered incorporating the terms of the interlocutory decree. It cannot be contended that in the *final* decree the court had no power to make a present and absolute disposition.

In *Wilson* v. *Wilson, supra,* the court discussed the problem under California law of an apparently present award in the interlocutory decree. It indicated that it might be proper to hold that an interlocutory decree may make a present disposition of community property, "but that the title thus conveyed is limited and conditional until the entry of the final decree" (p. 132). However, it solved the problem by striking from the decree all words presently disposing of the community property and inserting words to the effect that the final decree would dispose of it as set forth in the interlocutory decree.

## JUDGMENT NOT DEFINITIVE

Plaintiff contends that the court had no power to find that the community property was in excess of a certain value, but should have found the particular items which constituted the community property and that value. ■ The court found that "moneys in bank, real property . . . trust funds . . . stocks, bonds, and other securities . . . and other personal property . . . all of the foregoing comprising both his separate property and the community property . . ." In view of the commingling of separate and community funds that occurred in this case, the decree was sufficiently definitive. As pointed out before, more than $197,277.77 was shown chargeable to community income, and not accounted for by expenditures shown to have been made on behalf of the community. That the courts in dividing the community property may make money awards in lieu of specific property is well established. (See *Webster* v. *Webster,* 216 Cal. 485 [14 P.2d 522].) That the court need only find the value of the community property without specifying the items where it is making a money award in lieu of specific property appears from the decision in *Bailey* v. *Bailey,* 60 Cal.App.2d 291 [140 P.2d 693]. In *Meyer* v. *Meyer,* 184 Cal. 687 [197 P. 387], the court even required the husband to give a mortgage on the community property in Washington for the amount it awarded the wife. In the Bailey case the trial court had made what amounted to an in lieu money award. However, it failed to specify the value of the community property, and so the appellate court was unable to determine whether the award was equitable. The court said (p. 296) : "In the case at bar the trial court has failed to make any findings as to the nature and extent of the community property interest. This defect might be remedied by the appellate court, except for the fact, as already indicated, that the evidence is not

sufficient upon which to make a finding as to the value of the community property interest of the parties. Without first having ascertained the value of the community property interest involved, it would be impossible, under the circumstances of this case, to make any just or equitable award as to division of the property or compensation in lieu thereof. . . . Under the circumstances here presented, the trial court must be held to have abused its discretion in attempting to make an award of money in lieu of a division of property in kind, without first having found the value of the community property interest.'' In our case the court found the value of the community interest.

In *Crouch* v. *Crouch*, 63 Cal.App.2d 747 [147 P.2d 678], the trial court found that ''the exact amount and extent of the community property of the parties and the value thereof has not been accurately established herein'' (p. 755) and that $2,500 was a fair amount to be paid the wife in lieu of her community interest. In spite of the indefiniteness of the finding the court upheld the award as a proper exercise of legal discretion.

In *Washington* v. *Washington,* 91 Cal.App.2d 182 [204 P.2d 386], the court apparently only found what was the separate property of the wife. It then ordered that she pay the husband $500 as ''his share of any community property that may have been accumulated by the parties.'' (P. 183.) The award was upheld.

''Under various circumstances, an award of money to the wife in lieu of her interest in the real and personal property of the community has been sustained.'' (*Johnston* v. *Johnston,* 33 Cal. App.2d 90, 92 [91 P.2d 142].)

*Makzoume* v. *Makzoume,* 50 Cal.App.2d 229 [123 P.2d 72], cited by plaintiff, and *Kosloff* v. *Kosloff,* 67 Cal.App.2d 374 [154 P.2d 431], are not in point. There there were property settlement agreements, which the lower court had failed to approve or disapprove. Nor is *Solomon* v. *Redona,* 52 Cal. App. 300 [198 P. 643], which was an action for partition. In *Fox* v. *Fox,* 18 Cal.2d 645 [117 P.2d 325], and *Beaulac* v. *Beaulac,* 84 Cal.App.2d 649 [191 P.2d 478], the court held that the court could not assign the separate property of one of the spouses to the other, nor require one to pay to the other any amount in lieu of a division of that separate property. The court in our case has not attempted to do that. In *Reid* v. *Reid,* 112 Cal. 274 [44 P. 564], the case was not

remanded, as claimed by plaintiff here, because the trial court found that certain property was community property "except twelve hundred dollars' *worth*," but because of other reasons not relevant here. *Rozzi* v. *Rozzi*, 86 Cal.App.2d 535 [195 P.2d 464], also is not in point, as the court there was merely discussing the failure of the trial court to place a value on the property awarded the husband. While it remanded the case for other purposes, it refused to set aside the award to the husband.

The judgments are affirmed except as to the award to defendant of that portion of "all of the personal property presently in her possession" intended to be awarded plaintiff, and the case is remanded for the trial court to determine what "personal possessions, personal clothing or articles of personal adornment" should be awarded plaintiff. Costs are awarded defendant.

Peters, P. J., and Wood (Fred B.), J., concurred.