[L.A. No. 28919. In Bank. Oct. 30, 1967.]

JOAN MURIEL WEINBERG, Plaintiff and Appellant, v. FRANCIS STEPHEN WEINBERG, Defendant and Appellant.

Ward & Heyler and Charles A. Druten for Plaintiff and Appellant.

Edward Sumner for Defendant and Appellant.

TRAYNOR, C. J.—Both parties appeal from an interlocutory judgment granting a divorce to each, awarding alimony

to plaintiff wife, determining the property rights of the parties, and awarding fees and costs. Neither party challenges the part of the judgment granting the divorce, but each contends that in other respects the trial court committed various errors.

Plaintiff and defendant married on June 2, 1959, and separated on October 30, 1963. They have no children. Plaintiff had virtually no property at the time of the marriage. Defendant's net worth was $489,208.19, including all of the shares of All Metal Fabricators, Inc. and Alpha Engineering Corporation, 50 percent of the shares of Airborne Electronics Corporation, interests in employee profit sharing and retirement plan trust funds of two of the corporations, and several checking accounts. The trial court found that the net worth of both parties increased during the marriage to not less than $2 487,928.08, of which $338,164.93 was community property.

Defendant has two children by a previous marriage, which also ended in divorce. The decree in that case awarded custody of the children to defendant's former wife, incorporated a property settlement agreement, and ordered defendant to pay $1,800 per month alimony and $600 per month child support. During his second marriage defendant used community funds to pay the alimony and child support. The trial court held that defendant must reimburse the community for the alimony payments but that the child support was an obligation he could charge against the community estate. Plaintiff contends that neither the alimony nor the child support payments benefited the community and that therefore both should have been charged against defendant's separate property. Defendant contends that both obligations were debts he was entitled to discharge from community property. (See Civ. Code, § 172; *Grolemund* v. *Cafferata* (1941) 17 Cal.2d 679, 688 [111 P.2d 641].)

█ The policy of protecting the husband's creditors outweighs the policy of protecting family income even from premarital creditors of the husband. Community property is therefore available to such creditors. (*Grolemund* v. *Cafferata, supra,* 17 Cal.2d 679, 689; *Nichols* v. *Mitchell* (1948) 32 Cal. 2d 598, 610 [197 P.2d 550]; *Odone* v. *Marzocchi* (1949) 34 Cal.2d 431, 440 [211 P.2d 297, 212 P.2d 233, 17 A.L.R.2d 1109].) As such a creditor, a husband's first wife can levy against the community property of his second marriage for alimony payments due. (*Bruton* v. *Tearle* (1936) 7 Cal.2d 48, 57 [59 P.2d 953, 106 A.L.R. 580]; *Yager* v. *Yager* (1936) 7

Cal.2d 213, 220 [60 P.2d 422, 106 A.L.R. 664].) As manager of the community property "with like absolute power of disposition, other than testamentary, as he has of his separate estate" (Civ. Code, § 172), the husband may also voluntarily discharge such obligations from community property. In California, there are ordinarily no separate as distinguished from community debts of the husband. With exceptions not relevant here, "our community system is based upon the principle that all debts which are not specifically made the obligation of the wife are grouped together as the obligations of the husband and the community property." (*Grolemund* v. *Cafferata, supra,* 17 Cal.2d 679, 688.) It does not follow, however, that the community can never claim reimbursement from the husband's separate estate when community property has been used to discharge a husband's obligation. The husband's legal right of management and control has long been recognized to imply correlative duties to his wife. His duties are analogous to those of a partner; he cannot obtain an unfair advantage from the trust placed in him as a result of the marital relationship. (*Vai* v. *Bank of America* (1961) 56 Cal.2d 329, 337-339 [15 Cal.Rptr. 71, 364 P.2d 247]; *Fields* v. *Michael* (1949) 91 Cal.App.2d 443, 447-448 [205 P.2d 402].) Thus, in *Provost* v. *Provost* (1929) 102 Cal. App.775 [283 P. 842], the community was held to be entitled to reimbursement to the extent of community funds used by the husband for the improvement of his separate property. "To hold otherwise would be to permit the authority of the husband in controlling the community property, given him in the interest of greater freedom in its use and for its transfer for the benefit of both himself and his wife, to become a weapon to be used by him to rob her of every vestige of interest in the community property with which the law has expressly invested her. Such a conclusion would violate every sense of justice, and outrage every principle of fair dealing known to the law. The provisions of our code do not require us to so hold, nor do the prior decisions of this jurisdiction compel or warrant a ruling which would thus uphold the marital marauding of the wife's estate . . . ." (*Provost* v. *Provost, supra,* 102 Cal.App. 775, 781; see also *Estate of Turner* (1939) 35 Cal.App.2d 576, 580 [96 P.2d 363]; *White* v. *White* (1938) 26 Cal.App.2d 524, 530 [79 P.2d 759].)

Like considerations are present here. Defendant's alimony and child support obligations were incurred before his second marriage. They represent a continuing obligation, however,

based on both his community and separate incomes. (*Webber* v *Webber* (1948) 33 Cal.2d 153, 160 [199 P.2d 934]; *Mueller* v. *Mueller* (1956) 144 Cal.App.2d 245, 253 [301 P.2d 90]; Civ. Code, § 139.) During the second marriage the parties' net worth increased by approximately $2,000,000, of which only $338,000 was community property. Under these circumstances, it would be unjust to plaintiff to allow defendant to preserve his separate estate by using only community funds to meet alimony and child support obligations totaling more than $130,000 that were substantially based on his large separate income.

An apportionment of defendant's alimony and child support obligations between his separate income and the community income is both practical and fair. Defendant's total separate and community income during the period of his second marriage should be used to determine the proportionate amounts that his separate and community property will be charged. Although his earnings from separate property are sufficient to pay the whole, it would be inequitable to charge the obligations wholly to his separate income, since the obligations are continuing and based in part on his community earnings. In determining the proportion, however, his separate income must include capital increases in investments, even though the gains are not realized, for otherwise defendant would be free to use unrealized capital gains to deplete the community for the benefit of his personal estate.

Defendant contends that plaintiff received an income tax benefit from alimony expense deductions, and that the actual depletion of the community estate was therefore the net after-tax cost of the payments, not the gross amount of the payments. No specific computation of the actual benefit to plaintiff or detriment to defendant appears, but the record shows that both parties shared the benefit of the deductions for alimony, which were taken on joint tax returns. Defendant had the option of filing a separate return or a joint return and could choose whichever he felt was the most advantageous. That choice did not depend on whether defendant paid the alimony from separate or community income. Had the payments been correctly allocated against separate and community property, the tax would have been the same. Accordingly, no adjustment for the benefit either party received from the alimony tax deduction need be made.

At the time of his second marriage, defendant owned all the stock of All Metal Fabricators, Inc. and Alpha Engi-

neering Corporation, worth approximately $130,000. The trial court found that during the marriage the value of the stock increased by approximately $225,000 and that $95,000 of the increase could be attributed to growth of 7 percent per annum as a fair return on investment. (*Pereira* v. *Pereira* (1909) 156 Cal. 1, 11-12 [103 P. 488, 134 Am.St.Rep. 107, 23 L.R.A. N.S. 880].) It found that the balance of $160,000 was attributable to defendant's labor and skill, and was therefore community property. It ordered defendant to pay plaintiff half the balance in money. (See *De Burgh* v. *De Burgh* (1952) 39 Cal.2d 858, 874 [250 P.2d 598]; *Webster* v. *Webster* (1932) 216 Cal. 485, 488 [14 P.2d 522].)

Defendant contends that a 7 percent return is not currently considered to be a fair or adequate return on risk capital invested in a small, closely held corporation and that the increase in net worth of his wholly owned corporation was partially attributable to inflation and other general economic and business factors. Since he offered no evidence of current returns, however, the trial court correctly adopted the rate of legal interest. (*Pereira* v. *Pereira, supra,* 156 Cal. 1, 11-12; cf. *Tassi* v. *Tassi* (1958) 160 Cal.App.2d 680, 691 [325 P.2d 872].) Since he also offered no evidence of the effect of inflation and other economic factors on his corporations, the trial court properly disregarded those factors. (Cf. *Logan* v. *Forster* (1952) 144 Cal.App.2d 587, 601 [250 P.2d 730].)

■ Defendant raises a number of contentions concerning the tax consequences of liquidating his interests to pay his wife her share of the community estate. He bases some of these contentions on an erroneous statement of the trial court's findings. The trial court found profits and accruals in excess of defendant's separate property investment and interest thereon to be community property attributable to defendant's efforts, although he had only withdrawn part of that excess in the form of salary payments. Defendant assumes that the trial court found that he had neglected to withdraw "adequate" salaries from his wholly owned corporations. He contends that adequate withdrawals would have been taxed at a 70 percent rate, and concludes that plaintiff is entitled to only half the remaining 30 percent. The trial court was not concerned, however, with whether defendant paid himself an "adequate" salary, but only with what proportion of the business was community property. That proportion was not affected by a tax obligation that might have been but was not incurred.

■ Since both parties were awarded a divorce, the community property must be divided equally. (*De Burgh* v. *De Burgh, supra,* 39 Cal.2d 858, 874.) Defendant contends that the award to plaintiff of a money judgment for half the value of the community interest in his wholly owned corporations resulted in an unequal division, because liquidation of the assets requires payment of income taxes and will leave him with substantially less than the amount awarded to plaintiff. Such taxes, he asserts, should be paid out of community assets.[1]

■ The trial court did not abuse its discretion in awarding a money judgment for the value of plaintiff's interest instead of ordering a stock distribution to her. (*Webster* v. *Webster, supra,* 216 Cal. 485, 488; *Dallman* v. *Dallman* (1958) 164 Cal.App.2d 815, 819 [331 P.2d 245].)[2] Although there will be tax consequences if defendant satisfies the judgment by withdrawing funds from the corporations or selling some of his stock, there is no indication that he must or intends to do either to satisfy the judgment. He may choose to borrow the money or make the payments out of other property. Of course, once the property is divided pursuant to the trial court's order, the future tax consequences may vary on further sale or liquidation from what they would have been had the property been divided differently. The trial court need not speculate on such possibilities, however, or consider tax consequences that may or may not arise after the division of the community property. (Cf. *Harley* v. *Whitmore* (1966) 242 Cal.App.2d 461, 471 [51 Cal.Rptr. 468]; *Greene* v. *Wilson* (1962) 208 Cal.App.2d 852, 856 [25 Cal.Rptr. 630]; *Mayberry* v. *Whittier* (1904) 144 Cal. 322, 325 [78 P. 16].)

■ Plaintiff and defendant briefly set forth several other contentions regarding the tax effects of the trial court's

[1] The trial court refused to take taxes into account on the ground that defendant introduced no evidence of their effect. The record indicates, however, that defendant first received notice that the court would award a money judgment in lieu of a division of stock when proposed findings were prepared.

[2] Although the trial court might properly have given defendant the option of either conveying some of his stock to plaintiff or paying a money judgment, its failure to award stock to plaintiff was not an abuse of discretion, despite her interest in retaining an investment in the profitable businesses. The corporations were defendant's wholly owned separate property at the time of his remarriage; the increase in value was the result in large part of his personal skill and efforts. It is unlikely that the corporation could operate effectively with control split between recently divorced spouses, and defendant had adequate separate property to satisfy a money judgment.

award. None is supported by a sufficient showing of immediate and specific tax liability to establish any error in the trial court's failure to consider the possible tax consequences involved.

Plaintiff next contends that the trial court erroneously held the increase in value of defendant's investment in five related corporations (the "Hamilton Group") to be entirely separate property. In March 1958, defendant purchased 50 percent of the outstanding stock in Airborne Electronics for $1,000; by the time of his remarriage it was worth $57,212.91. During the first 18 months of his second marriage, defendant purchased 40 percent of the issued and outstanding shares in Hamilton Electro Sales for $4,000, 50 percent of the outstanding shares in Electro Ad Agency for $500, 25 percent of the issued shares in Hamilton Electronics for $1,250, and 40 percent of the issued shares in Hamilton Electric Sales-North for $1,000. In October 1961, Airborne Electronics changed its name to Hamilton Electro Corporation and acquired all of defendant's stock in the five corporations in exchange for 241,200 shares of Hamilton Electro stock. In October 1961, defendant sold 27,500 shares for $187,687.50. In November 1962, the assets and stock of Hamilton Electro Corporation were acquired by Avnet Electronics Corporation and defendant received 106,850 shares of Avnet stock. In February 1963, he sold 26,700 shares for $550,594.26. At the time of the trial defendant owned 83,374 shares of Avnet stock with a market value of $1,073,440.25. Cash dividends during his second marriage totaled $60,643.98.

It is undisputed that defendant invested his separate property in the Hamilton Group and rendered some services to the five corporations involved. The trial court found, however, that "no portion of the increase in the value of the stock of said corporations is attributable to defendant's personal character, energy, ability, capacity or services; that defendant expended only a minimal effort; that there is no evidence attributing a value to defendant's services; and that the same is the separate property of defendant."

"An apportionment of profits is required not only when the husband conducts a commercial enterprise but also when he invests separate funds in real estate or securities. [Citations.] The proceeds and increment in value are apportioned entirely to the husband's separate estate only when they are attributable solely to the natural enhancement of the property [citations] or when the husband expended only minimal effort

and the wife introduced no evidence attributing a value to his services. (*Cozzi* v. *Cozzi*, 81 Cal.App.2d 229, 232 [183 P.2d 739]; *Estate of Barnes*, 128 Cal.App. 489, 492 [17 P.2d 1046].)'' (*Estate of Neilson* (1962) 57 Cal.2d 733, 740-741 [22 Cal.Rptr. 1, 371 P.2d 745].) The evidence supports the trial court's finding that defendant's efforts were minimal within the meaning of the foregoing rule.

The record shows that from the time of his remarriage until he severed his connection with Avnet Electronics except as a shareholder, defendant spent virtually all of his time and efforts in the management of the business affairs of All Metal Fabricators, Inc. and Alpha Engineering Corporation. Defendant owned all the stock in these two corporations and served as president and director of each. Defendant owned only 50 percent of the shares of the Hamilton Group, and the other major stockholder, Tony Hamilton, directed the business affairs of the five corporations. Although defendant assisted in setting up several of the corporations and was given the title of vice-president and director of each of the five corporations, and although he later assumed the title of president of Hamilton Electro Corporation for one fiscal year, he attended only a few board meetings of the latter and none of the other four corporations, and devoted no time to their affairs or management. He received no salary except from Hamilton Electro Corporation, for which he devoted ''perhaps an hour a week,'' usually during the lunch hour, to its affairs; he had no desk, telephone, clerical help, or office facilities. The hour was spent mainly consulting with Mr. Hamilton. He assisted in obtaining a bank loan for Hamilton Electro Corporation, and discussed with Mr. Hamilton whether or not to place the banker on its board of directors, but generally he participated only to a ''limited extent'' in policy decisions. He and Hamilton had the idea of reorganization and public offering, but this work was done primarily by a law firm. The acquisition of the Hamilton Group assets was initiated by Avnet and carried out by negotiations between it and Tony Hamilton; although defendant took a trip to New York in connection with the transaction, Hamilton took care of ''most of the stuff'' relative to the Avnet acquisition.

Even though defendant's efforts were minimal, plaintiff was entitled to introduce other evidence that they were nevertheless of measurable value. (*Kenney* v. *Kenney* (1954) 128 Cal.App.2d 128, 139 [274 P.2d 951].) Since she did not do so, however, the trial court did not err in not

allocating any of the increase in value in defendant's invest-
ment in the Hamilton Group to the community. (*Estate of
Neilson, supra,* 57 Cal.2d 733, 740-741.)

 Plaintiff next contends that the evidence does not
support the trial court's finding that assets acquired with
funds from an account with Security First National Bank
were defendant's separate property. At the time of his remar-
riage, defendant had $793.88 in a checking account in the
Santa Monica Bank. During the marriage he made deposits
totaling $262,507.91, either directly or through a savings
account that he subsequently opened in the same bank. Plain-
tiff was authorized to draw checks on the checking account,
and did so during the marriage. Both parties used the account
for items such as living expenses, taxes, alimony, child sup-
port, and medical expenses. The trial court found the $113.43
balance in the Santa Monica account to be community prop-
erty. At the time of his remarriage, defendant also had a
balance of $31,235.07 in a checking account in the Security
First National Bank. Plaintiff was never authorized to draw
checks against this account and never did so. During the mar-
riage, defendant made a number of deposits in the Security
Bank account. He could not identify the sources of the depos-
its made between June 2, 1959, and November 16, 1961, dur-
ing which time he made several investments in stocks with
funds withdrawn from the Security Bank account. Plaintiff
contends that the separate funds originally on deposit with
the Security Bank at the time of the marriage were exhausted
by October 31, 1959, and that because deposits to the account
were not identified or traced, defendant has not carried the
burden of overcoming the presumption that the deposits were
community property. (Civ. Code, § 164, *Estate of Sehabiague*
(1941) 47 Cal.App.2d 793, 798 [119 P.2d 30]; *Estate of
Boody* (1896) 113 Cal. 682, 687 [45 P. 858]; *Estate of Dun-
can* (1937) 9 Cal.2d 207, 217 [70 P.2d 174].) Accordingly,
plaintiff contends that the stocks purchased with funds from
the account between June 2, 1959, and November 16, 1961, are
community assets. (*Pope* v. *Pope* (1951) 102 Cal.App.2d 353,
362 [227 P.2d 867].)

The evidence is sufficient to rebut the presumption and sup-
port the trial court's finding that the funds in the Security
Bank account were defendant's separate property. Defend-
ant's only community income, apart from interests in various
trust funds and increases in the value of his businesses, was
salary income, and there is no evidence of community funds

received by defendant from any other source. Defendant testified that he deposited all his salary checks in the Santa Monica Bank, either in the checking or savings account. There is no evidence that community funds were deposited elsewhere, nor is there evidence that disbursements for community purposes were made out of the Security Bank account rather than the Santa Monica Bank account. An exhibit prepared by defendant's accountant, which compares his net salaries to deposits in the Santa Monica Bank from June 1959 to June 1963, shows that in two years deposits were greater than the salaries and in the other two years deposits were less than the $70,000 per year salaries by only approximately $10,000; over the four-year period total salary income was $260,391.04 and total deposits were $262,507.91. The trial court was justified in finding that defendant segregated his community income in the Santa Monica Bank account and kept it apart from his separate income, which he deposited in a different bank, and that any increase in defendant's Security Bank account, although not entirely accounted for, was from separate property. (Civ. Code, § 163.)

Defendant next contests the trial court's award of $4,400 to plaintiff as separate property. Plaintiff received a $4,400 check in settlement of a cause of action for personal injuries, which she indorsed and delivered to defendant. He deposited it in his Santa Monica Bank savings account, which was a community account, and thereafter the money was transferred to the Santa Monica joint checking account used by both parties to pay community expenses. Under these circumstances plaintiff must be presumed to have made a gift of the $4,400 to the community, for "a wife who uses her separate funds in payment of family expenses without agreement regarding repayment cannot require her husband to reimburse her. [Citations.] . . . The basic rule is that the party who uses his separate property for community purposes is entitled to reimbursement from the community or separate property of the other only if there is an agreement between the parties to that effect." (*See* v. *See* (1966) 64 Cal.2d 778, 785 [51 Cal.Rptr. 888, 415 P.2d 776].)

Plaintiff contends that the separate fund was entrusted to defendant as a fiduciary and that since she did not transfer the money from the savings account to the checking account, she did not knowingly use her separate funds in payment of family expenses. She therefore concludes that no presumption of a gift arose. There is no support in the record for

plaintiff's contention that she turned the money over to defendant merely for safekeeping. Plaintiff testified that "I haven't the foggiest notion how much [the settlement] was. Frank took the money. I asked him what it was, and everything, and he said, 'Why do you need it?' He said I am a rich woman, so he put it in his own account." Plaintiff knew the source of the money, and consented voluntarily to its disposition by defendant on the ground that she did not need it. She cannot now complain because the money was used by both defendant and herself to pay community expenses. She imposed no restrictions on how the money was to be used, and there was no agreement regarding reimbursement. Accordingly, the trial court erred in finding that the fund remained separate property. (*See* v. *See, supra,* 64 Cal.2d 778, 785.)

Defendant finally attacks the trial court's order to pay plaintiff's $20,000 legal fees out of his separate property. (Civ. Code, § 137.3.) Defendant contends that plaintiff's attorney's fees should have been charged against the community property before it was distributed. He relies on the statement in *Wilson* v. *Wilson* (1948) 33 Cal.2d 107, 113 [199 P.2d 671], that the theory behind such an award is to compensate the wife for the husband's use of the community estate to pay his attorney. Section 137.3 of the Civil Code is not so limited, for it gives the court discretion to order payment of "such amount as may be reasonably necessary . . . for attorney's fees" without regard to the available sources. Even when the wife has separate property in addition to community property, the trial court need not require her to resort to her own capital for payment of her counsel before ordering her husband to pay attorney's fees. (*Crevolin* v. *Crevolin* (1963) 217 Cal.App.2d 565, 572-573 [31 Cal.Rptr. 622]; *Sigesmund* v. *Sigesmund* (1953) 115 Cal.App.2d 628, 632 [252 P.2d 713]; *Primm* v. *Primm* (1956) 46 Cal.2d 690, 696 [299 P.2d 231].) Here plaintiff had no separate property. No abuse of discretion appears.

Since the trial court erred in allocating the child support and alimony payments between separate and community property and in awarding plaintiff the $4,400 representing her personal injury damages, the judgment must be reversed insofar as it adjudicates the property rights of the parties. Since the award of alimony may have been based in part on the division of property, it must also be reversed. The parts of the judgment determining the property rights of the parties and awarding alimony are reversed. The other parts of the

judgment are affirmed. The trial court is directed to amend its findings of fact and conclusions of law in accord with the views expressed herein, to redetermine the amount of alimony, and to enter the appropriate judgment. Plaintiff shall recover costs on these appeals.

McComb, J., Peters, J., Tobriner, J., Mosk, J., Burke, J., and Sullivan, J., concurred.

The petition of defendant and appellant for a rehearing was denied November 29, 1967.