[Civ. No. 45919. Second Dist., Div. Four. Dec. 19, 1975.]

In re the Marriage of FRANCES and STANLEY FOLB.
FRANCES FOLB, Respondent, v.
STANLEY FOLB, Appellant.

864

**COUNSEL**

Kaplan, Livingston, Goodwin, Berkowitz & Selvin and John A. Schulman for Appellant.

Wainer & Stone and Ivan R. Wainer for Respondent.

## OPINION

**JEFFERSON (Bernard), J.**—This is an action for dissolution of marriage. Stanley Folb, respondent husband below, appeals from those provisions of an interlocutory judgment granted to his wife, Frances Folb, petitioner below, which directed equal division of community property valued at $2,044,445.88. We affirm this judgment.

The parties first married in 1949. Two children were born of this first marriage. The parties divorced in 1958, but in 1959, they considered remarriage. Husband testified at the trial that, in an effort to avoid the disagreements over finances which had troubled the first marriage, he caused an antenuptial agreement to be drafted and presented to the wife. The thrust of the proposal was that all property owned by either party at the time of remarriage was to remain the separate property of the owner throughout the remarriage, as were all earnings from the properties in question.

Wife sought legal counsel. Her holdings at this time were relatively minimal. She was advised that the agreement as drafted was not fair. It was suggested that she insist on a time limitation with respect to the holding of separate property by the parties after remarriage. A provision was then added to the agreement (by interlineation) that limited the separate-property-holding clause to the first four years of the proposed remarriage. The trial court interpreted the antenuptial agreement, as amended, as providing that, after said four-year period, all earnings from property held by either party would be community in nature. The parties executed this agreement and remarried in June 1959. After the remarriage, one child was born in 1964. On December 31, 1971, the parties again separated. At the time of separation their property was valued at $4,264,770.

The foregoing interpretation of the amended antenuptial agreement was made by the trial court after receiving extrinsic evidence concerning the intent of the parties, and the interpretation is not questioned by husband on this appeal.

The trial court found that husband, a successful owner and developer of commercial property, possessed assets of $1,124,926 in June 1963, when the four-year period referred to in the antenuptial agreement ended. Most of these assets consisted of his net equity interest in commercial property developed by him. The values assigned to most of

the property, which are set forth in the trial court's findings, were arrived at by the stipulation of the parties. At issue throughout the proceedings below was the value, as of June 1963, of a lot located at 1800 North Highland Avenue, Los Angeles (hereinafter referred to as Highland). The trial court's determination in this regard will be discussed, *infra.*

The trial court determined that husband was entitled to a 12 percent annual return on his separate commercial property assets from June 1963, to the date of separation, December 31, 1971. The trial court further held that he was entitled to a 7 percent annual return, for the same period, on cash held by him as of June 1963. After crediting husband with his separate holdings and the accumulated return, which totalled $2,220,324.12, the trial court determined that the remaining property interests, valued at $2,044,445.88, constituted the community property of the parties that was subject to equal division.

Husband's principal contentions on this appeal relate to the procedure employed by the trial court, as described above, in evaluating and awarding the community property of the parties.

Husband first contends that the trial court incorrectly valued Highland at $161,065 as of June 1963. Husband testified that Highland was worth $3,450,000 at that time, and that his net equity interest in the property amounted to $1,475,743.19. The trial court's adoption of the low-figure value was based primarily on the testimony of wife's accountant, Price.

The great discrepancy in the market value placed on Highland by the parties occurred because Highland was in a state of transitional development in June 1963. Evidence adduced below established that husband had acquired the Highland lot in November 1962, for $156,036; that at a subsequent time, but before June 1963, he had contributed this lot to a partnership in which he held a 97 percent interest, and had received $161,065 in return for this contribution. Price's testimony was given in relation to an exhibit introduced below by wife without objection. The record is void of any evidence of any factual dispute as to the accuracy of the acquisition price of Highland or of the amount paid to husband for his contribution of Highland to the partnership. Husband contends on appeal that evidence of the acquisition price paid for Highland and the amount subsequently paid to husband for his contribution of Highland to the partnership, prior to June 1963, is irrelevant in establishing Highland's market value in June 1963.

It is well settled, in condemnation proceedings at least, that "[e]vidence of the price paid for condemned real property on a sale prior to the proceedings in which condemnation is sought is generally admissible in such proceedings, at least where the sale is voluntary, is not too remote in point of time, or is not otherwise shown to have no probative value." (55 A.L.R.2d 791, 793-794, § 2[a].) Evidence Code section 815 is to the same effect in providing that "[w]hen relevant to the determination of the value of property, a witness may take into account as a basis for his opinion the price and other terms and circumstances of any sale or contract to sell and purchase which included the property or property interest being valued or any part thereof if the sale or contract was freely made in good faith within a reasonable time before or after the date of valuation . . . ." ■ This principle of the relevancy of evidence of the price of a sale or purchase of property being valued, made within a reasonable time before or after the date of valuation, found in condemnation proceedings, seems applicable here.

The Highland lot had been acquired for the purpose of constructing an office building. Husband testified that he commenced development of the property for this purpose in January 1962, prior to acquisition; that as of June 1963, he had taken the following steps toward his goal: he had obtained the requisite zoning; he had employed an architect, who had drafted the building plan; and engineering and contracting services had been secured. Husband also testified that construction financing had been obtained from the Union Bank in the amount of $1,974,256. The record reveals that as of June 1963, the lot had been excavated but actual construction had not yet begun. There is no dispute that the building permit was secured in July 1963, and that thereafter construction started and the building was actually completed in 1965.

Husband's testimony as to the value of Highland in June 1963, was based upon the premise that since he had expended the necessary time, effort and skill to develop Highland prior to June 1963, all that remained to be done was to reap the profits from his effort, and that the asset was worth completion value at this time. His testimony was supported by that of appraiser Nason, who placed a value of $3,250,000 on Highland as of June 1963, with a net equity to husband of $1,275,743. Upon cross-examination, Nason explained that his appraisal of Highland as of June 1963, as a completed structure, even though building construction had not then commenced, was based on the fact that such an appraisal method was an acceptable practice in the construction lending industry; that lending institutions normally determined the extent of their lending

to a project on prospective appraisals, i.e., the value of the completed project. However, Nason offered the figure of $208,320 as an alternative appraisal of Highland as an excavated lot as of June 1963. It is to be noted that no specific concrete cost figures were presented to the trial court concerning husband's effort and actual outlay on Highland in addition to the acquisition cost expended prior to June 1963. The trial court, therefore, had before it several vastly different valuations, and chose the lower one.

Our review of this determination is based on the principle that the determination of the value of a particular asset is a factual one, and that if there is substantial evidence to support it contained in the record, the determination must be upheld on appeal. We recognize that section 4800, subdivision (a) of the Family Law Act requires an equal division of community property, and that the trial court, therefore, is required to make specific findings concerning the nature and value of all assets of the parties before the court. (*In re Marriage of Lopez* (1974) 38 Cal.App.3d 93, 107 [113 Cal.Rptr. 58]; *In re Marriage of Juick* (1971) 21 Cal.App.3d 421 [98 Cal.Rptr. 324].) Neither the Family Law Act, nor the decisional law of this state relating to community-property division, offers any particular guidance as to how the value of a disputed real property asset should be ascertained.

The three basic approaches which have been recognized in determining market value of real property (especially in condemnation and tax law) are commonly termed (1) the market data or comparable sales approach (see Evid. Code, § 816); (2) the reproduction cost approach (see Evid. Code, § 820); and (3) the capitalization of income approach (see Evid. Code, § 819; Ehrman & Flavin, Taxing Cal. Property (1967) § 277, pp. 258-259; Condemnation Practice in Cal. (Cont.Ed.Bar 1973)).

Husband argues that the decisional law dealing with condemnation of real property supports the method of determining the value of a lot in terms of specific dollar amount, as if the building structure planned for it is complete. He cites *City of Daly City v. Smith* (1952) 110 Cal.App.2d 524 [243 P.2d 46] in support of his argument. But the *Daly* case simply reiterates the classic legal definition of "value" of land found in *Sacramento etc. R.R. Co. v. Heilbron* (1909) 156 Cal. 408, 409 [104 P. 979]: ". . . the measure of this damage [in a condemnation proceeding] is the market value [of the land]; that is to say, the highest price estimated in terms of money which the land would bring if exposed for sale in the

open market, with reasonable time allowed in which to find a purchaser, buying with knowledge of all of the uses and purposes to which it was adapted and for which it was capable." This definition has been applied in numerous California condemnation proceedings and in cases involving real estate taxation as well.[1] (See, e.g., *People* v. *Ricciardi* (1943) 23 Cal.2d 390 [144 P.2d 799]; *De Luz Homes, Inc.* v. *County of San Diego* (1955) 45 Cal.2d 546 [290 P.2d 544].)

In *Daly,* it was held that in condemnation proceedings, evidence could be introduced concerning proposed improvements on the land as contemplated by the owner, and the value thereof—not, however, for the purpose of determining the specific value of the land as if it were improved property, but for consideration by the trier of fact as one factor in determining the market value of the *unimproved* property. Such evidence was held relevant on the issue of the highest and best use of the property as an element to be considered in determining market value. (See *People* v. *Ocean Shore Railroad* (1948) 32 Cal.2d 406 [196 P.2d 570, 6 A.L.R.2d 1179].) The *Daly* court was careful to state that "it is market value that is involved, and not the value to the owner . . . ." (*Daly, supra,* 110 Cal.App.2d 524, at p. 531.)

Other California cases emphasize the distinction between proffered evidence of the best possible prospective uses of property and proffered evidence of prospective property value in specific dollar terms, based on the completion of an admittedly feasible plan for land development. The former type of evidence is admissible while the latter type is inadmissible. (*Buena Park School Dist.* v. *Metrim Corp.* (1959) 176 Cal.App.2d 255 [1 Cal.Rptr. 250]; *Santa Clara County Flood Control & Water Conservation Dist.* v. *Freitas* (1960) 177 Cal.App.2d 264 [2 Cal.Rptr. 129]; *People* ex rel. *Dept. Pub. Wks.* v. *Silveira* (1965) 236 Cal.App.2d 604 [46 Cal.Rptr. 260]; *People* ex rel. *Dept. Pub. Wks.* v. *Princess Park Estates, Inc.* (1969) 270 Cal.App.2d 876 [76 Cal.Rptr. 120]; *City of Pleasant Hill* v. *First Baptist Church* (1969) 1 Cal.App.3d 384 [82 Cal.Rptr. 1].)[2] In the

---

[1] See Revenue and Taxation Code sections 110 and 110.5.

[2] In Condemnation Practice in California (Cont.Ed.Bar 1973) there is reference to what is termed the "economic" approach to land valuation, i.e., the estimation of land value by abstraction. (§ 4.51, pp. 72-73.) This method, involving projected development, expense and profit, has had limited acceptance; there have been some federal cases which have approved this method of evaluating raw land which is suitable for subdivision for residential construction. (See *Drakes Bay Land Company* v. *United States* (1972) 459 F.2d 504 [198 Ct.Cl. 506]; *United States* v. *100 Acres of Land etc., Marin Cty.,* *Cal.* (9th Cir. 1972) 468 F.2d 1261; *United States* v. *147.47 Acres of Land in Monroe Cty., Pa.* (M.D.Pa. 1972) 352 F.Supp. 1055.)

instant case the trial court allowed husband to develop his proposed theory of evaluation including the estimate of a specific prospective dollar value of Highland as a completed asset. However, husband failed to offer specific evidence of pre-June 1963 costs expended or incurred by him (which could have included a value placed on his services), costs which might well have been taken into consideration by the trial court in arriving at a "market value" figure of Highland as unimproved vacant land.

But we know of no legal principle which would permit a finding of market value of unimproved land on the date of value as if it were already in the improved state contemplated. Nor does reason or logic support husband's position. As of June 1963, the question of whether Highland would be transformed into a vastly more valuable improved office building property several years later—considering all the possible expense-producing and other obstacles that might be encountered—was one of sheer speculation.

It is to be noted that wife offered no witness, qualified as an expert in real property valuations, to express an opinion as to the market value of Highland as of June 1963. No evidence was offered to qualify the accountant, Price, as an expert in real property appraisals. Evidence Code section 813 provides that the value of property may be shown only by the opinions of witnesses qualified to express such opinions and of the owner of the property being valued. But Evidence Code section 813 has application only to eminent domain and inverse condemnation proceedings by virtue of Evidence Code section 810 which states: "This article [sections 810 to 822] is intended to provide special rules of evidence applicable only to eminent domain and inverse condemnation proceedings."

Neither statutory nor case-law authority has been called to our attention that requires, in other areas where property values must be determined by the courts, adherence to the condemnation-law method of determining market value of real property solely from the opinions of expert witnesses. In condemnation proceedings, the trier of fact may not consider evidence of sales of comparable property or evidence of sales of the property being valued as independent proof of the value of the property, but only as a factor to be used in weighing the opinion testimony of value expressed by the witnesses. (Evid. Code, §§ 813-821.)

There is decisional-law authority that holds that, in a non-condemnation proceeding, market value of personal property may be established by evidence other than expert-witness testimony of value. Thus, in *Bagdasarian v. Gragnon* (1948) 31 Cal.2d 744, 755 [192 P.2d 935], the court stated: "Market value of personal property may, of course, be established by testimony of expert witnesses, but this is not the only method, and it has been generally held that the reasonable value of marketable personal property may be shown by market prices or actual specific sales of *other similar* property, provided such sales are bona fide and not too remote in time or place. [Citations.]" (Italics in original.)

In the absence of statutory compulsion to the contrary, both reason and logic dictate that the rule expressed in *Bagdasarian* for valuation of personal property should be applicable in noncondemnation proceedings for the determination of market value of real property. ██ Accordingly, we hold that the trial judge below was not required to base his determination of the value of Highland solely upon the opinion testimony of witnesses qualified as experts in real property valuation.

██ Certainly, evidence of prior sales of Highland, the real property being valued, was relevant evidence to be considered by the trial court in determining the value of Highland as of June 1963. In *People v. Vinson* (1950) 99 Cal.App.2d 100 [221 P.2d 161], the court held that it was appropriate for an owner's valuation expert witness to be cross-examined about the amount paid for the real property by the owner some three years prior to the valuation date. In support of this holding, the *Vinson* court aptly remarked: "Both reason and common sense support the view that if selling prices of comparable property are properly taken into account in forming expert opinions as to value, a recent purchase of the *identical property* would be of first importance." (*Vinson, supra,* 99 Cal.App.2d 100, at p. 102.) (Italics added.) ██ We conclude, therefore, that the value assigned to Highland by the trial court is supported by substantial evidence.

Husband next attacks the trial court's determination that he was entitled to a 12 percent annual return on his separate-property holdings from 1963 to 1971, which consisted of his commercial investment. He argues that the court incorrectly applied the *Pereira* approach (*Pereira v. Pereira* (1909) 156 Cal. 1 [103 P. 488]) in allowing such a return, in light of the evidence before the court. The *Pereira* formula was discussed in a subsequent case, *Estate of Gold* (1915) 170 Cal. 621, 623 [151 P. 12], in the following terms: ". . . the question what part of the subsequent profits [of

separate capital] arises from the use of this capital, and what part from the personal activity, ability, and capacity of the husband, is to be determined by the court from the circumstances appearing in the case, that whatever accrues from the latter source is community property, and that the remaining profits must be classed as separate estate."

Husband points out that the return allowed in *Pereira*, i.e., 7 percent, was the result of a stipulation of the parties rather than the result of weighing of evidence concerning the husband's effort. He argues that there was uncontradicted evidence, presented in the testimony of experts Shapiro and Zak, that the annual rate of return from the type of holdings of husband in the instant case would range from 14 percent to 22 percent (Shapiro) or from 15 percent to 20 percent (Zak), and that the trial court ignored the testimony.

The record shows that the trial court made the following finding with respect to the annual return generated by the husband's separate commercially invested capital: "The Court finds that although evidence was introduced by Respondent to the effect that the rate of return allocable to Respondent's separate estate should be found by the Court to be in the sum of fourteen percent (14%) to eighteen percent (18%) per annum, the Court finds that because a portion of Respondent's community services were devoted to the care, maintenance and development of his separate estate, a fair and reasonable rate of return is in the sum of twelve percent (12%) per annum, simple interest. The aforementioned evidence introduced by Respondent concerning the rate of return did not take into consideration the element of Respondent's efforts which were community in nature, but which Respondent devoted to Respondent's separate estate from June 4, 1963, to December 31, 1971."

In *Beam v. Bank of America* (1971) 6 Cal.3d 12, 18 [98 Cal.Rptr. 137, 490 P.2d 257], the California Supreme Court observed: "Over the years our courts have evolved two quite distinct, alternative approaches to allocating earnings between separate and community income in such cases. One method of apportionment, first applied in *Pereira v. Pereira* (1909) 156 Cal. 1, 7 [103 P. 488] and commonly referred to as the *Pereira* approach, 'is to allocate a fair return on the [husband's separate property] investment [as separate income] and to allocate any excess to the community property as arising from the husband's efforts.' [Citation.] [Fn. omitted.] The alternative apportionment approach, which traces its derivation to *Van Camp v. Van Camp* (1921) 53 Cal.App. 17, 27-28 [199 P. 885], is 'to determine the reasonable value of the husband's services . . . ,

allocate that amount as community property, and treat the balance as separate property attributable to the normal earnings of the [separate estate].' [Citation.]"

The *Beam* opinion goes on to say that " 'the court is not bound either to adopt a predetermined percentage as a fair return on business capital which is separate property [the *Pereira* approach] nor need it limit the community interest only to [a] salary fixed as the reward for a spouse's service [the *Van Camp* method] but may select [whichever] formula will achieve substantial justice between the parties. [Citations.]' " (*Beam, supra,* 6 Cal.3d 12, at p. 18.)

Thus, the trial court has considerable discretion in choosing a method of allocating the separate and community return on a husband's separate holdings. In the case at bench, husband specifically argues that little community effort was made by him with respect to his commercial investments from 1963 to 1971; he claims to have occupied the status of a "passive investor" in the commercial properties he owned.

There was ample evidence, however, and the trial court so found, that husband was an unusually skillful developer of raw land. He was active in every phase of development either personally or through the efforts, supervised by him, of personnel selected by him, including obtaining necessary financing and supervising actual construction. The trial court specifically found that an element which contributed greatly to his success was his undertaking the function of general contractor with respect to his buildings. He also selected and advised the personnel who rented the commercial space thereafter. It cannot be concluded, therefore, that (in contrast to the husband in the *Beam* case, *supra*) he simply relied on the fact of his separate investment throughout the marriage to generate capital; on the contrary, the evidence showed that he expended great effort in enhancing that capital. The trial court did not ignore the testimony of his experts concerning the rate of annual return generated by commercial holdings during the period in question; it merely decreased the percentage so generated by assigning a percentage value (probably about 6 percent) to the community investment in husband's separate holdings. The resulting 12 percent, used by the trial court, is amply supported by the record.

It is also contended by husband, without citation of case authority, that the annual rate of interest should have been compounded. Such treatment of the separate capital would have substantially diminished

the interest of the community. ▉ The "substantial justice" referred to in *Beam* would not have been achieved by such a result.

Husband asserts that the trial court erred in allowing a 7 percent annual return on cash in husband's possession as of June 1963, on the ground that the determination was not supported by the evidence and, furthermore, was inconsistent with the treatment afforded husband's commercial investment.

The record reflects that husband had cash assets of $123,024 as of June 1963. Husband introduced a cash-flow sheet to demonstrate that these funds were actually used to increase husband's commercial investment, and, hence, should be subject to the same annual rate of return as noncash property interests. The record also establishes, however, that husband never drew a fixed salary during the years in question, but withdrew funds as he needed them from the various bank accounts which contained his cash assets, without maintaining separate accounts or records of his expenditures. ▉ The trial court adopted the *Pereira* method in assigning the annual rate of return to these holdings in bank accounts, and we find no error in this determination.

Husband claims that the community property of the parties was not equally divided, as mandated by section 4800, subdivision (a) of the Family Law Act of 1970. There is no doubt that the trial court was under the duty to make an equal division. *(In re Marriage of Lopez, supra.)* The finding of the trial court in the first instance was that the community property of the parties as of December 31, 1971, was $2,044,445.88. One-half of this sum, amounting to $1,022,222.94, was awarded to each spouse. The trial court also directed that wife's attorneys be paid $60,000 from the community property prior to division, and that real property taxes of $5,590.29 be paid from the community cash prior to division. No real argument is made that real property taxes on the family home, which was found to be community, do not constitute a proper community expense.

It could be contended, however, that since husband must bear the total cost of his own attorneys out of his separate property or his share of the community, it is unequal division to require him to pay one-half of his wife's attorney fees from his share of the community, which results from payment out of the community property prior to division. While prior to the Family Law Act it was held proper for the parties to request that the trial court order payment of the wife's attorney fees from community

property (*Wong* v. *Superior Court* (1966) 246 Cal.App.2d 541 [54 Cal.Rptr. 782]), this issue arose again in a decision made after enactment of the Family Law Act. (*In re Marriage of Jafeman* (1972) 29 Cal.App.3d 244, 262-267 [105 Cal.Rptr. 483].) There the argument was made that such payment resulted in unequal division of the community. But the court pointed out that *Weinberg* v. *Weinberg* (1967) 67 Cal.2d 557 [63 Cal.Rptr. 13, 432 P.2d 709], had held, prior to the act, that the trial court could properly award the payment of attorney fees "without regard to the character of the funds from which the payment may ultimately be made." (*Jafeman, supra,* 29 Cal.App.3d 244, at p. 264.) *Jafeman* proceeded to hold that since the Family Law Act contained provisions (primarily in § 4370) for the allowance of attorney fees, it was the legislative intention that such awards could be made independent of the "equal division" mandate contained in section 4800, subdivision (a) of the act. Consequently, *Jafeman* held that it was proper for the trial court to direct that the payment of the wife's attorney fees be made from husband's share of the community. ■ In view of the decisional law, we find no inequality in the trial court's division of the community in the instant case.

Husband makes one final argument concerning the division of the community property. He points out that he received, as his share of the community, commercial property with a low-cost basis for tax purposes—property which had already been considerably depreciated. It is argued that this fact was not taken into account by the trial court. We are asked to take judicial notice of certain provisions of the Internal Revenue Code which render increased tax liability of husband a certainty. It appears, however, that most of the values assigned to the commercial assets awarded to husband were arrived at by the stipulation of the parties. ■ Hence, it is too late to complain of their incorrect value for division purposes.

Prior to the Family Law Act, a similar contention was made concerning future tax consequences in *Weinberg* v. *Weinberg* (1967) 67 Cal.2d 557 [63 Cal.Rptr. 13, 432 P.2d 709]. The Supreme Court rejected the argument that future tax consequences require consideration by the trial court; it noted that in the case before it, immediate and specific tax liability had not been demonstrated, because there was no necessity of liquidating assets, and that speculation concerning possible future tax consequences was not required. Husband herein distinguishes the *Weinberg* decision by claiming that his tax position can be ascertained with certainty and is not a matter of speculation.

It may well be that with the growth of complicated analysis rendered necessary by the equal-division formula mandated in community property litigation, new approaches to property evaluation and division will gain acceptance. Some forerunners of a more flexible approach may be seen in the cases of *In re Marriage of Rosan* (1972) 24 Cal.App.3d 885 [101 Cal.Rptr. 295] and *In re Marriage of Lopez* (1974) 38 Cal.App.3d 93 [113 Cal.Rptr. 58]. In *Rosan,* the trial court took into account future consequences in evaluating stock awarded to husband at 70 percent of its stated (possible) value. In *Lopez,* the court, in discussing the problem of determining present value of a law practice, observed that *" 'the conceptual view of the economic value of any asset is based on the future receipts which the asset will produce.' "* (*Lopez, supra,* 38 Cal.App.3d 93, at p. 108.) (Italics in original.)

Proof of an asset's ascertainable future value, however, including its diminution by the application of the tax laws, must be presented to the trial court for its consideration; we find no such presentation in this record. This is not a matter that can be determined from judicial notice of the content of tax legislation.

Pending this appeal, wife, who did not appeal from the judgment, made application to this court, pursuant to rule 23(b) California Rules of Court, to produce evidence relative to the appeal, and requested this court, as authorized by Family Law Act section 4810,[3] to revise accordingly the interlocutory judgment disposing of the community assets of the parties.

This court denied wife's motion, without prejudice, pointing out that it would place the court in the position of hearing evidence concerning disputed issues of fact and weighing that evidence. We reconsider it now, as well as the most recent motion (to strike certain portions of husband's reply brief, opposed by husband in a letter communication to this court) which relates to matters that have been in continued litigation in the trial court pending this appeal.

Our examination of the superior court file establishes that when the trial court divided the community property of the parties, it awarded to

---

[3] "The disposition of the community property, of the quasi-community property and of the homestead, as above provided, is subject to revision on appeal in all particulars, including those which are stated to be in the discretion of the court."

wife as part of her share of the community a certain note upon which payments were being made to husband by a corporation which had purchased an office building from him. The note was secured by a third deed of trust, and the amount payable thereon at the time of the interlocutory judgment was $346,937. After judgment was entered, husband filed notice of appeal. When wife commenced execution on certain assets, husband obtained an appeal bond pursuant to Code of Civil Procedure section 917.1, which provides for a stay of execution on money judgments; the amount of the bond was $240,877.41. Despite the fact that the interlocutory judgment required not only the payment of money but delivery of documents (Code Civ. Proc., § 917.2) and conveyance of real property (Code Civ. Proc., § 917.4), neither of the latter bonding provisions was required of husband. While this appeal has been pending, the payor of the note defaulted, and the holder of the first trust deed foreclosed on the security. Wife was unable to take any steps to save her interest because she was without funds. Husband did not attempt to cure the default. As a result, roughly one-third of the assets awarded to wife as her one-half of the community property in the interlocutory judgment are apparently no longer in existence. Thus, the wife's motion for relief here.

We assume that the wife is claiming a violation by the husband of the principle that a husband holding the community property is regarded as a fiduciary for his wife and, as such, may be held to account for his stewardship of community assets, even after the interlocutory judgment (*Vai* v. *Bank of America* (1961) 56 Cal.2d 329 [15 Cal.Rptr. 71, 364 P.2d 247]), and that the provision in the interlocutory judgment relating to the transfer by husband to wife of the corporate note in question contains language which could be interpreted as a guarantee of payment of an amount equal to that due on the note as of the time of entry of the interlocutory decree.

But we must reiterate that matters occuring after judgment are generally not reviewable on appeal, particularly when relief is sought by a nonappealing party such as wife in the instant case. (*People's Home Sav. Bank* v. *Sadler* (1905) 1 Cal.App. 189 [81 P. 1029]; see 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 220, p. 4210.) The trial court remains the more appropriate forum in which to litigate these subsequent developments. We additionally decline to grant wife's motion to strike, but note that we are not bound by the content of

affidavits subsequently filed below by either party in making our decision here.

The judgment appealed from is affirmed.

Kingsley, Acting P. J., and Dunn, J., concurred.

A petition for a rehearing was denied January 8, 1976.