[Civ. No. 69630. Second Dist., Div. Six. Feb. 24, 1984.]

In re the Marriage of MELANIE K. and LLOYD P. LISTER.
MELANIE K. LISTER, Appellant, v.
LLOYD P. LISTER, Appellant.

**COUNSEL**

Nordman, Cormany, Hair & Compton and Glenn M. Reiser for Appellant Wife.

Ferguson, Regnier & Paterson and William E. Paterson for Appellant Husband.

**OPINION**

**GILBERT, J.**—We here affirm an interlocutory judgment dissolving the marriage of Lloyd Lister (husband) and Melanie Lister (wife), and ordering husband to reimburse the community for property used to satisfy his premarital and postseparation debts and to pay a portion of his wife's attorneys' fees.

## FACTS

Husband and wife married on August 24, 1974. They separated in December 1979, reconciled in April 1981, and again separated in July of 1981. The interlocutory judgment of dissolution, entered March 1, 1982, gave wife custody of the two minor children of the parties and provided for child support but no spousal support. In the equal division of community property and debts, husband received the interest in the Central Plaza Union Station, which he operated in equal partnership with his cousin Jerald Riefkohl, and wife was awarded the family residence and furnishings.

When husband and wife were married, they purchased a single family home on Mammoth Street in Camarillo. They lived there until March 1976 when they purchased another home on Corte Aquacalte. The Riefkohls then moved into the Mammoth residence and made the mortgage payments. Title was transferred to the Riefkohls in March 1978 by a quitclaim deed executed by husband and wife. No cash changed hands but Jerald Riefkohl cancelled husband's premarital debts in the amount of $20,330.73. No documentary evidence was introduced regarding these alleged loans other than ledger entries showing cash advances Jerald Riefkohl made to husband between May 1972 and June 1974.

Wife and her father, William Thompson, testified that husband told them he sold the house to the Riefkohls for $48,000 with a $23,000 gain. Wife signed the quitclaim deed to complete the sale, but she testified that had she known the house was to be traded to the Riefkohls solely in exchange for cancellation of husband's premarital debts, she would not have agreed to the transaction. She also testified that she executed the quitclaim deed to the Riefkohls in 1976 without the presence of a notary, thinking it was an escrow document. The court noted that the quitclaim deed was notarized and dated in 1978. At about the time husband delivered the quitclaim deed to them, the Riefkohls entered into an agreement to sell the property to others for $58,000 for a net gain of $28,000.

Husband's testimony was inconsistent with respect to his disclosures to his wife. He testified at his deposition that he told her nothing at the time the house was transferred. At trial he said he explained to her that his cousin had agreed to cancel a substantial amount of debts in exchange for the equity in the house, that he reviewed these amounts with her, and that she agreed to those terms. He admitted that he did not identify the debts as his premarital obligations, but denied that he had told her the house was sold.

During the 15 months husband and wife were separated (Dec. 19, 1979 to Apr. 1981), husband gave his $200 weekly draw on the service station

to his wife and allegedly borrowed $1,000 a month for living expenses from his cousin. After the couple reconciled, husband prevailed on his wife to refinance their home with a $40,000 second trust deed. The net proceeds were deposited in a new account opened by the service station at Security Pacific National Bank and Jerald Riefkohl credited $15,000 of this sum to repayment of the money husband had "borrowed." Wife was not told either that her husband had incurred this alleged debt during their separation, or that it was to be repaid from the loan proceeds. She testified that she was told that the entire loan proceeds were placed in the Central Plaza Union Station account for use in the business.

The trial judge found that wife did not know about or consent to the transfer of the house to the Riefkohls solely in cancellation of her husband's premarital debts. The judge thus concluded the transfer was a breach of husband's fiduciary obligation to his wife and an abuse of his power of management and control. (Civ. Code, § 5125.) He also found that husband had transferred this community asset to a creditor to satisfy a debt that was not as great as the value of the asset. He therefore ordered husband to reimburse the community $20,330.73. In addition, the judge treated the $15,000 received by husband during the 1981 separation as his separate debt which he had improperly repaid from a loan on a community asset, and ordered reimbursement. He also ordered husband to pay $4,250 toward his wife's attorneys' fees.

## DISCUSSION

Husband argues that the consent of his wife was not required for the transfer of the Mammoth residence because the community received consideration for that transfer. (*Gunn* v. *United Air Lines, Inc.* (1982) 138 Cal.App.3d 765 [188 Cal.Rptr. 302]; *In re Marriage of Smaltz* (1978) 82 Cal.App.3d 568 [147 Cal.Rptr. 154].) This ignores the court's finding that he misrepresented the transaction to his wife, who signed the quitclaim deed believing a sale of the property had been made.

█ The trial court's finding that husband misappropriated a community asset " 'is binding upon an appellate court if it is supported by sufficient evidence or if it is drawn from evidence which is conflicting or subject to differing inferences.' [Citations.]" (*In re Marriage of Walter* (1976) 57 Cal.App.3d 802, 805 [129 Cal.Rptr. 351].) This finding is supported by the testimony of both wife and her father concerning her husband's misrepresentations and Jerald Riefkohl's testimony that the sole consideration for the transfer was the cancellation of husband's premarital debts.

█ The community property, with the exception of wife's earnings, traditionally is liable for all debts of the husband, however and wherever

contracted. (*Weinberg* v. *Weinberg* (1967) 67 Cal.2d 557, 563 [63 Cal.Rptr. 13, 432 P.2d 709].) Nonetheless, the community may be entitled to reimbursement if the husband uses community property funds to discharge his separate indebtedness. (*In re Marriage of Walter, supra,* 57 Cal.App.3d, 806; see also 7 Witkin, Summary of Cal. Law (8th ed. 1974) Community Property, § 84, pp. 5173-5174.)

Currently spousal obligations are viewed first from the creditors' standpoint and for this purpose the community property is liable. ■ On dissolution of the marriage where equal division of the community property and liabilities are in issue, transactions of the spouses *inter se* are subject to review and the separate debts of one spouse may be excluded from the shared community obligations. (See *In re Marriage of Epstein* (1979) 24 Cal.3d 76, 89 [154 Cal.Rptr. 413, 592 P.2d 1165].) "Between the spouses, certain obligations which are properly characterized as separate may be assigned to the responsible person if unpaid, or reimbursement may be ordered in favor of the community if the debt was paid from community assets." (*In re Marriage of Stitt* (1983) 147 Cal.App.3d 579, 587 [195 Cal.Rptr. 172].) ■ Although the community property may be at risk where one spouse has separate debts, this does not preclude the court from ordering reimbursement to the community following a nonconsensual transfer of community real property. (See, e.g. *Mitchell* v. *American Reserve Ins. Co.* (1980) 110 Cal.App.3d 220 [167 Cal.Rptr. 760].)

In the case of *In re Marriage of Stitt, supra,* 147 Cal.App.3d 579, wife incurred an obligation for attorneys' fees for her defense on charges of embezzlement. Husband transferred to wife his community interest in the family residence in reliance on her representation that it would be prudent to do this because of her embezzlement trial. She told him that the property would be conveyed back to him after completion of the trial. Wife's attorneys took a note for their fees secured by a trust deed on the family residence. The court, applying equitable principles, held that husband should receive his community interest free of this debt because of "the separate nature of the obligation" of the wife. (*Id.,* at p. 588.) The court also recognized that her conduct which gave rise to the obligation to pay attorney's fees was tortious or criminal. (Civ. Code, § 5122.)

Here, although the conduct giving rise to husband's obligation was not tortious, and was not as egregious as wife's conduct in *Stitt,* the same equitable principles should nevertheless apply. Husband's actions in mismanaging the community property constituted a violation of Civil Code section

5125.[1] It is questionable whether husband's debt was collectible. Other than some journal entries showing advances made between May 6, 1972 and June 3, 1974, there was no documentary evidence of this debt. There were no checks written for the money, no promissory notes, and no agreements indicating when the money should be repaid. Although the statute of limitations operates on the remedy and does not extinguish the debtor's obligation (*Mitchell* v. *County Sanitation Dist.* (1957) 150 Cal.App.2d 366, 370 [309 P.2d 930]), the statute of limitations defense still may have been available to wife. (See Code Civ. Proc., § 339, subd. (1); *Dorland* v. *Dorland* (1884) 66 Cal. 189, 190 [5 P. 77].)

The circumstances of this case are distinguishable from *Gunn* and *Smaltz* upon which husband heavily relies. The sole question in *Gunn* was whether a surviving second wife was entitled to share, after her husband's death, in that portion of his retirement fund attributable to the increase in its value during their marriage. Under the terms of a property settlement agreement with his first wife, husband had received the retirement fund subject to a proviso that he designate the four sons of his first marriage as beneficiaries. The court held that his contributions to the fund during his second marriage were not gifts of community property which would entitle his second wife to claim a share of the proceeds. Instead, these were contractual obligations under a property settlement agreement for which the community property of the second marriage was liable.

Similarly, in *Smaltz,* the community was not entitled to reimbursement for payments of spousal support which husband had made to a former wife from community property pursuant to court order. *Smaltz* noted, by contrast, that the community has a right to reimbursement if a spouse has abused the right of management and control. (Civ. Code, § 5125.) Neither *Gunn* nor *Smaltz* involved bad faith dealings between the spouses. Here, husband acted in bad faith in managing the community. The court therefore properly ordered him to reimburse the community for the amount of his premarital obligation.

■ Husband next contends that the trial court improperly ordered him to reimburse the community an additional $15,000 he allegedly borrowed

---

[1]Section 5125 provides in pertinent part: "(c) A spouse may not sell, convey, or encumber community personal property used as the family dwelling, or the furniture, furnishings, or fittings of the home, or the clothing or wearing apparel of the other spouse or minor children which is community personal property, without the written consent of the other spouse.

"(d) A spouse who is operating or managing a business or an interest in a business which is community personal property has the sole management and control of the business or interest.

"(e) Each spouse shall act in good faith with respect to the other spouse in the management and control of the community property."

from his cousin Jerald Riefkohl for living expenses during the first separation. During this 15-month separation husband gave his $200 weekly draw on the service station to wife and borrowed $1,000 a month from his cousin. He then repaid this money after reconciliation from the proceeds of a loan taken on the Corte Aquacalte residence.

Husband and wife finally separated in July 1981, only four months after they reconciled. During their brief reconciliation they placed a $40,000 loan on their home and husband used $15,000 of this amount to repay Jerald Riefkohl. Although the evidence was inconclusive, the trial court presumed the advances totalling $15,000 were loans rather than gifts. The court noted that by giving his service station draw to his wife without a court order, husband converted his own expenses to loans and was later able, in effect, to repay himself from community property.

The court correctly held that husband was not entitled to use funds from a loan on community property to repay this separate obligation. (*In re Marriage of Walter, supra,* 57 Cal.App.3d 802, 806-807; *In re Marriage of Mahone* (1981) 123 Cal.App.3d 17, 25 [176 Cal.Rptr. 274].) Husband's earnings while separate were his separate property (Civ. Code, § 5118), as were debts he incurred after separation which were not related to the community, and the court did not abuse its discretion in ordering him to reimburse the community. (*In re Marriage of Hopkins* (1977) 74 Cal.App.3d 591, 600 [141 Cal.Rptr. 597].)

Husband also contends the trial court erred in denying his request that the community reimburse him for $3,886.20 in payments he made on the second trust deed on the Corte Aquacalte house after the final separation. Although he was required by court order to make only the first trust deed payments, he voluntarily made payments on the second trust deed to avoid foreclosure.

█ As a general rule, a spouse who voluntarily utilizes separate property for community purposes is presumed to intend a gift and is not entitled to reimbursement in the absence of an agreement. (*Weinberg v. Weinberg, supra,* 67 Cal.2d 557, 570.) The no-reimbursement rule does not apply after separation because the reason for presuming that the paying spouse intended to make a gift has disappeared. In order to avoid discouraging payment of community debts, the rule is that "a spouse who, after separation of the parties, uses earnings or other separate funds to pay preexisting community obligations should be reimbursed therefor out of the community property upon dissolution." (*In re Marriage of Epstein, supra,* 24 Cal.3d 76, 84.) Nonetheless, *Epstein* suggests that reimbursement should not be ordered where it would be inappropriate, for example, where the payment in reality

discharges a support obligation, or where circumstances show it would be unreasonable for the party making the payment to expect reimbursement.

■ Although husband claims he also borrowed the money for the second trust deed payments from Jerald Riefkohl, the payments were made by checks written on Central Plaza Union Station accounts. The court found that the payments were not made from husband's postseparation earnings and that to the degree the payments reduced the principal balance, the community equity in the house was increased. Since the result was an exchange of substantially equivalent values between community assets, the service station and the house, the court did not abuse its discretion in denying husband's request for reimbursement.

Finally, there is no merit in husband's contention that the trial court improperly ordered him to pay $4,250 toward his wife's attorneys' fees. The court concluded, "[I]n view of the limited community property assets and the fact the issues to be tried required a considerable expenditure of attorneys' time and effort, it would be unfair for [wife] to bear a disproportionate share of the attorneys' fees."

Husband argues that the court ordered him to pay these attorneys' fees as punishment after he filed a request for a statement of decision, but this is completely unsupported by the record. He additionally claims that his wife is not in need of this payment because her father will pay her attorneys' fees. This is conjecture which the record does not support.

■ It is well established that "[t]he reasonableness of an order for attorney's fees is a matter which lies within the sound discretion of the trial court and absent a clear showing of abuse, the trial court's determination will not be disturbed." (*In re Marriage of Millet* (1974) 41 Cal.App.3d 729, 731 [116 Cal.Rptr. 390]; see also *In re Marriage of Taylor* (1981) 122 Cal.App.3d 209, 215 [175 Cal.Rptr. 716].) ■ The court in making an award of attorneys' fees is entitled to consider the entire litigation and not merely the relative incomes of husband and wife. (*In re Marriage of Millet, supra,* 41 Cal.App.3d 729, 731-732.) There must be evidence to show the wife's need of money for that purpose, and her ownership of separate property does not necessarily negate this need. "[A] wife is not required to impair the capital of her separate estate in order to defray her litigation costs. [Citations.]" (*In re Marriage of Jafeman* (1972) 29 Cal.App.3d 244, 264 [105 Cal.Rptr. 483].)

■ Here, wife was working, and had custody of two small children. Her expenses, including her mortgage payments, were substantially in excess of her income. On the other hand, the evidence suggested that husband

enjoyed substantial unreported income in addition to that disclosed on his financial statement. This evidence established wife's need and husband's ability to pay.

In addition, the court ordered this payment because wife incurred substantial attorneys' fees in investigation of the operations of the Central Plaza Union Station and the transactions between husband and his cousin, the true character of which husband had misrepresented or withheld from her. The court in the exercise of its sound discretion made the award of the attorneys' fees to equalize an otherwise unjustly disproportionate division of obligations.

The judgment is affirmed. Wife to receive costs on appeal.

Stone, P. J., and Abbe, J., concurred.