Opinion
 

 KAUS, P. J.
 

 —Dissolution of marriage. Respondent and appellant is Ruth M. Hopkins. Petitioner and cross-appellant is Herbert S. Hopkins. She appeals from those portions of the judgment which divide the community property, award spousal support, and award attorney’s fees. He appeals from that portion of the judgment which divides the community property.
 
 [1]
 

 Facts
 

 The parties were married in June 1941 and separated in March 1975. They have one child, an adopted son, bom in September 1960. When this matter was heard, in August 1975, the son was 15, Herbert was 62, and Ruth was 60 years old. Herbert, a certified public accountant, grossed about $1,800 a month and netted about $1,465 a month, which equaled his claimed living expenses. Ruth, licensed as an attorney but unemployed, had stipulated expenses of about $850 a month.
 

 The judgment provided, in summaiy, as follows: 1) Ruth was awarded $300 a month spousal support for three years, the support to “terminate forever” at the end of the 36th month. 2) Herbert was awarded custody of the minor child. 3) Community property totaling about $112,000 was divided. Herbert was awarded the family residence, unencumbered and valued at $48,000, and was ordered to execute a $12,500 note, secured by a first trust deed on the residence, payable to Ruth at $135 a month at 7 percent interest until paid in full.
 

 Details of the property division are discussed below.
 

 
 *596
 
 Discussion
 

 Spousal Support
 

 Ruth was, as noted, 60 years old when the matter was heard, and had been married to Herbert for 34 years. Although she had been admitted to practice law in Michigan in 1949, and in California in 1961, she had worked only a total of 16 months as a lawyer—8 months with an attorney and 8 months with an insurance company in 1972. She was fired from both of those jobs.
 
 [2]
 
 She had not worked until recently because her husband objected; he wanted to have her “at the home” and had “always had a ‘hang-up’ about the idea of working wives.” However, during the previous two or three years Herbert had suggested that Ruth get a job and she had tried, but without success.
 
 [3]
 
 It is uncontradicted that Ruth was emotionally unstable.
 

 There is no need to belabor the point that it was plainly erroneous for the trial court to limit the duration of spousal support to three years.
 
 In re Marriage of Brantner
 
 (1977) 67 Cal.App.3d 416, 420-423 [136 Cal.Rptr. 635];
 
 In re Marriage of Kelley
 
 (1976) 64 Cal.App.3d 82, 89-95 [134 Cal.Rptr. 259];
 
 In re Marriage of Dennis
 
 (1973) 35 Cal.App.3d 279, 284-285 [110 Cal.Rptr. 619];
 
 In re Marriage of Rosan
 
 (1972) 24 Cal.App.3d 885, 897-898 [101 Cal.Rptr. 295] make this an a fortiori case.
 

 At the time of the dissolution, this had been a 34-year marriage. The cited cases nail down the rule that after “a lengthy marriage retention of jurisdiction to modify spousal support should be the norm and the burden of proof of justification for terminating the order should be on the party seeking termination.”
 
 (In re Marriage of Brantner, supra,
 
 67
 
 *597
 
 Cal.App.3d 416, 421.) Nothing in the record before us justified the trial court to depart from the norm. Ruth was an inexperienced 60-year-old woman who happened to be admitted to practice law but whose prospects of finding gainful employment were virtually nonexistent.
 
 [4]
 
 The court was not justified in “burning its bridges.”
 
 (In re Marriage of Dennis, supra
 
 35 Cal.App.3d 279, 285.)
 

 The trial court’s erroneous assumption that all Ruth had to do in order to find a job as a lawyer was to ask for one, also demands a reversal of the amount of spousal support ordered.
 
 [5]
 

 Community Property
 

 1.
 
 Division of Real Property
 

 The trial court, as noted, awarded the family home to Herbert and certain income-producing units to Ruth. There is no merit to Ruth’s contention that the court abused its discretion in not awarding her the home. First, Herbert did get custody of the son, and second, although Ruth makes much of the fact that she never managed the income units, nothing requires her to retain that property.
 

 The court did, however, abuse its discretion in its attempt to equalize the division of community property by ordering Ruth to accept a $12,500 note, bearing interest at 7 percent, payable at the rate of $135 per month and secured by a first trust deed on the family home.
 

 Preliminarily, we find no merit to Ruth’s contention that even a cash payment of $12,500 would not have equalized the division. Her argument is based entirely on valuations which the trial court did not have to accept.
 

 We do, however, agree that under all of the circumstances of this case, the court was not justified in equalizing the division by making Ruth an
 
 *598
 
 unwilling home financer. We recognize, of course, that subdivision (b)(1) of section 4800 of the Civil Code permits the trial court, where “economic circumstances warrant” to use this particular technique for equalizing the division of community property. It must, however, be recognized that what happens in such a case is that one spouse gets the lion’s share of the community property, for which he or she must pay with assets to be acquired in the future.
 
 (In re Marriage of Juick
 
 (1971) 21 Cal.App.3d 421, 428 [98 Cal.Rptr. 324].)
 

 The record in this case fails to support the trial court’s implied finding that the parties’ economic circumstances warranted such an emergency arrangement. The family home was free and clear. Nothing in the record suggests that Herbert could not have borrowed $12,500 on its security. Further—give or take a few hundred dollars—Herbert had the necessary $12,500 in liquid assets.
 
 [6]
 
 These assets were, of course, the primary source for equalizing the division of community property. Finally, even if it had been appropriate to order Ruth to accept a note and deed of trust, the order which the court made is fatally defective in two other respects. First, the rate of interest, 7 percent, is and was below the prevailing rate for this type of loan. This decreased the market value of the note below its face amount and therefore did not equalize the division of community property.
 
 (In re Marriage of Tammen
 
 (1976) 63 Cal.App.3d 927, 930-931 [134 Cal.Rptr. 161].) Second, a note given under such circumstances should contain a provision that the entire balance becomes due and payable on certain events, such as the borrower’s death or the sale or refinancing of the home. Under the court’s judgment Herbert can sell the house any time he wishes and, in practical effect, Ruth would be lending her money to strangers for just about the rest of her life expectancy.
 

 Under all of the circumstances it was an abuse of discretion to equalize the division of community property in the manner ordered by the trial court.
 

 Trial Court’s Bias and Prejudice
 

 Ruth claims bias and prejudice by the trial court, relying principally but not exclusively on the fact that it announced virtually at the outset of
 
 *599
 
 the trial that Ruth would and could find employment. Similar sentiments were allegedly expressed in more colorful language during an unreported chambers conference before the formal taking of evidence commenced.
 

 Whatever its merit, this point was not properly preserved. The pretrial chambers conference was obviously called to settle the financial aspects of the litigation, or at least as many issues as possible. We know that the parties stipulated to submit the issue of child custody on the report of a court investigator. Certain other stipulations were entered into and later made part of the record. This “settlement conference” turned, almost imperceptibly, into the reported trial. No suggestion of bias was made at any time until Ruth’s then counsel filed an affidavit in support of her motion for a new trial. This came too late. (Develop-
 
 Amatic Engineering
 
 v.
 
 Republic Mortgage Co.
 
 (1970) 12 Cal.App.3d 143, 150 [91 Cal.Rptr. 193].)
 

 Division of Personal Property
 

 1. There is no merit to Ruth’s contention that the trial court abused its discretion in not determining and dividing the good will of Herbert’s practice. The issue was not raised below.
 

 2. The parties stipulated to the value of many items of community property, including the family residence, stipulated to be worth $48,000, Herbert’s Fiat, $3,000, Ruth’s Ford, $2,000. After the hearing, Ruth learned that these values were inaccurate—that the house was worth $57,000, the Fiat $4,600, and the Ford, only $1,400.
 

 Contraiy to Ruth’s contention, she is bound by the stipulation. No “fiduciary relationship” was violated solely because Ruth and her attorney decided to rely on the values offered by Herbert. This was an adversaiy proceeding in which both sides were represented by counsel. Herbert, of course, did not conceal assets; he had no better access to information by virtue of his status as the managing partner in the marriage, and nothing in the record suggests that he induced Ruth to rely on his valuations. That Ruth and her attorney believed Herbert knew what he was saying because he was “on the court’s approved list of appraisers and could qualify as an expert,” reflects only a mistake in judgment.
 

 
 *600
 
 3. The trial court did not err in requiring Ruth to pay certain obligations—chiefly, miscellaneous department store charges—incurred after the parties separated. The earnings and accumulations of each spouse after separation are the separate property of that spouse. (Civ. Code, § 5118.) There is no reason that debts incurred after separation and unrelated to the community should not also be separate. That an unpaid creditor of Ruth’s might have been entitled to recover against the community under Civil Code section 5116 should not mean that the trial court is disabled from requiring a spouse after separation to pay his or her post-separation bills.
 

 4. Ruth contends that the trial court erred in classifying as community property money in a bank account which consisted of $1,700 received from her father, dividends from her stock and $300 a year, which her husband had given her over a period of about 15 years. We agree. The parties stipulated that the property which the court found to be community was, in fact, the separate property of Ruth: “We are also willing to stipulate the items set forth-, I believe it is on the response, as to moneys and stock constitute the separate property of Mrs. Hopkins. I believe they are on her response, some bank accounts and some stock.” The response shows that the two bank accounts which the court found to be community were listed as Ruth’s separate property. That stipulation should have been binding and will be binding on retrial.
 

 5.
 
 Attorney’s Fees
 

 The trial court found that both parties had the ability to pay their own attorney’s fees and costs and entered judgment accordingly. Ruth contends that the trial court abused its discretion in ordering her to pay her own attorney’s fees. We agree. “In order to be entitled to an award [of attorney’s fees] the wife must demonstrate that her resources are not sufficient to meet the expenses of litigation. [Citation.] However, a wife is not required to impair the capital of her separate estate in order to defray her litigation costs. [Citations.]”
 
 (In re Marriage of Jafeman
 
 (1972) 29 Cal.App.3d 244, 264 [105 Cal.Rptr. 483].)
 

 Although, as Herbert points out, Ruth appears to have separate property worth about $18,000, there is no evidence that Ruth had any significant amount of income. To the contrary, it appears that Ruth’s income was limited to $200 per month temporaiy spousal support and about $75 a month in income from her separate property.
 

 
 *601
 
 6.
 
 Accountant’s Fees
 

 The trial court appointed appraisers to value Herbert’s business and ordered that their report be paid from the community property. Although not entirely clear, the court-appointed appraisers may have submitted two—rather than one—reports. The trial court ordered that $180 be paid to the appraisers but did not order that Ruth be reimbursed for the $920 she claimed to have paid to them. At this point, the parties either cannot agree or do not know whether the court-appointed appraisers submitted one or two reports under their orders from the court. On remand, the trial court is instructed to redetermine the amounts owed to the court-appointed appraisers, and if, in fact, Ruth paid those appraisers with her separate funds for work ordered by the court, she is to be reimbursed from the community.
 

 Cross-Appeal
 

 In about 1960 Herbert established a tentative “Totten” trust savings account for the parties’ son. At one point Ruth may have signed a signature card in connection with the account. For about 10 years Herbert deposited $100 per month in the account. Starting in 1968 Herbert withdrew funds from the account and made purchases of securities which complied in form with the Uniform Gifts to Minors Act. (Civ. Code § 1155 et seq.) At the time of trial the securities were worth about $28,000; there was also about $4,000 in the bank account. Herbert testified that he had discussed the amount with Ruth on many occasions and that she had informally referred to the existence of a bank account and securities owned by the son. Ruth insisted that she did not learn about the account until after this litigation started. In answer to a question from the court she replied that the amount deposited was excessive: “I had no idea it was $100 a month on our limited income. .1 was living on $187 a month. It was more than I was living on.”
 

 There is no evidence that Ruth was aware of any specific stock transaction, or that she knew that the transactions were made in formal compliance with the Uniform Gifts to Minors Act. There is no evidence that Ruth consented orally or in writing that the revocable deposits into the bank account should become irrevocable gifts of securities to the son.
 

 Based on this evidence the court found that “both parties, with full knowledge, jointly consented to the withdrawal from their funds of any
 
 *602
 
 and all property, both real and personal, which are deposited to the credit of their son . . . that [Herbert] never concealed the activities of the accounts for their son from [Ruth]” and did not dissipate the community property. The funds, however, “were not deposited irrevocably as a gift but subject to such disposition as the parties might dictate from time to time.” The court then, by mutual consent, set aside a certain sum for the son’s education and found that the balance was community.
 

 On his cross-appeal Herbert claims that the finding that the gifts to the son were not irrevocable is not supported by the record.
 

 We do not doubt that Herbert could have, with Ruth’s consent, made an irrevocable gift of the community property to his son. The trial court was, however, entitled to infer that Ruth had not consented to an irrevocable gift of nearly $33,000. In fact,, there was no evidence that she had so consented. The finding that she had consented to the deposits in no way militates against the finding that she had not agreed to irrevocable gifts.
 

 Herbert moved this court for leave to produce additional evidence on appeal which would demonstrate that, in fact, an irrevocable gift had been made. We denied that motion; Herbert had an adequate opportunity below to substantiate that an irrevocable trust had been established. We note, though, that the proposed evidence does not help Herbert: It consists of 14 stock certificates, captioned, with minor variations, “Herbert S. Hopkins as custodian for Herbert S. Hopkins, Jr., under the California Uniform Gifts to Minors Act,” and various transaction notices from a stock brokerage firm showing the account to be in Herbert’s name as custodian for Herbert Junior. Thus, although Ruth was a cotrustee in the saving’s account, she was not included as custodian in Herbert’s stock purchases for his son, and there is still not a shred of evidence that she ever consented to transactions resulting in $28,000 in stock at the time of dissolution.
 
 [7]
 

 Disposition
 

 Unless the parties stipulate otherwise, the retrial shall be confined to those issues which we have found to have been incorrectly decided. (See
 
 *603
 

 In re Marriage of Steinberg
 
 (1977) 66 Cal.App.3d 815, 821 [136 Cal.Rptr. 299].)
 

 Reversed. Costs to appellant and cross-respondent.
 

 Stephens, J., and Ashby, J., concurred.
 

 A petition for a rehearing was denied November 25, 1977, and the petition of appellant Wife for a hearing by the Supreme Court was denied December 28, 1977.
 

 [1]
 

 Ruth’s notice of appeal also includes the award of custody of their minor child. No argument concerning child custody is made on appeal and we assumé she has abandoned any complaint she may have.
 

 [2]
 

 Based on this showing, Herbert’s brief gallantly describes Ruth as “an attorney with recent employment experience.”
 

 [3]
 

 She testified: “I went to the Federal Government. I had two interviews with the State . . . before I took my first job,” and after she was fired she “went through them again, and I was held unqualified to be on their list with the State, and I am also [unqualified for the Lawyers Referral Service under their minimum case requirements. I have put ads in the legal journals. I have registered with the State Employment Department for professional people. I have applied to professional recruiters, and I have explored the volunteer route which I couldn’t go to Legal Aid because Mr. Hopkins is employed there and he asked me not to apply to the Legal Aid Society.” She did not pass the examination for the district attorney’s office. She had answered “several hundred” ads in the Daily Journal. She applied at the State Bar, and “they said that they had 80 applicants [for two positions], whereas usually they only had 20, and mine was not even considered.”
 

 [4]
 

 This statement is not only supported by the record but by our judicial knowledge of the job market in the legal profession.
 
 (Denham
 
 v.
 
 Superior Court
 
 (1970) 2 Cal.3d 557. 565 [86 Cal.Rptr. 65, 468 P.2d 193].)
 

 [5]
 

 The trial court’s optimism with respect to Ruth’s future as a practicing lawyer is hard to reconcile with some rather pointed questions it asked her during the trial such as: “If I divide the community property, ... do you think you are capable of managing whatever money that I give you? Do you think there should be a guardian or somebody appointed, or a conservator, to take care of your affairs?”
 

 [6]
 

 These assets consisted of marketable securities, about half of which were Herbert’s separate property. Since the note would have been paid with separate property acquired in the future, we see no reason for ignoring separate property Herbert already owns. In this connection, we have not even taken into consideration Herbert’s share of the sum of about $30,000 in community assets discussed in connection with his cross-appeal,
 
 infra.
 

 [7]
 

 Moreover, given the evidence that Ruth did not consent to the gift to her son, even if the trust were irrevocable, the gift was voidable by Ruth (Civ. Code, § 5125; e.g.,
 
 Bank of California
 
 v.
 
 Connolly
 
 (1973) 36 Cal.App.3d 350, 377 [111 Cal.Rptr. 468].)