[No. A052112. First Dist., Div. Two. Oct. 29, 1992.]

In re the Marriage of JOHN B. and ANN K. HUNTINGTON.
JOHN B. HUNTINGTON, Respondent, v.
ANN K. HUNTINGTON, Appellant.

**[Opinion certified for partial publication.\*]**

*Pursuant to rules 976 and 976.1, California Rules of Court, the written opinion filed October 29, 1992, is certified for publication except for part I.

COUNSEL

Forden Athearn for Appellant.

Camera & Colyer, Lisa M. Roseli and Paul Camera for Respondent.

OPINION

KLINE, P. J.—Ann K. Huntington appeals from a judgment of dissolution of marriage. She contends the judgment must be reversed because the trial

court failed to render a written statement of decision. She further urges the trial court adopted an erroneous interpretation of Civil Code section 4801 and abused its discretion in awarding her spousal support of $5,000 a month for a period of only six months and in denying her request for attorney fees and costs.

## STATEMENT OF THE CASE

On March 27, 1989, respondent filed a petition for legal separation from appellant; he subsequently filed a petition for dissolution of marriage on April 27, 1989, and an amended petition for dissolution of marriage on July 21, 1989. The parties had been married on August 24, 1985, and separated three years and seven months later on March 28, 1989.

Trial proceeded on October 22, 23, 30 and 31, 1990. The trial court ordered spousal support of $5,000 per month for a period of six months, to permanently terminate thereafter, and ordered the parties to bear their own attorney fees and costs. Appellant had been receiving temporary spousal support of $7,500 per month since May 1, 1989, and her attorney had previously received $19,000 from respondent for attorney fees pursuant to prior court order and stipulation.

On November 6, 1990, appellant moved for reconsideration of the attorney fees issue. The court granted the motion and reaffirmed its prior order.

Appellant filed a timely notice of appeal on December 31, 1990.

## STATEMENT OF FACTS

Respondent is a wealthy man with a net worth in excess of $15 million. At the time of the marriage, appellant was 28 years old and respondent 47. Appellant had been working as a dental hygienist, earning about $30,000 a year, but stopped working shortly before the marriage when respondent told her it would not be necessary for her to work. The day before the marriage, the parties entered into a premarital agreement providing for their property to remain separate.

The parties' standard of living during the marriage was extremely high. Respondent owns a home in Tiburon valued at $2.5 million, an 18.2-acre property in Tahoe worth $3 million, and 9 cars, and the court found he has a controllable annual cash flow of approximately $500,000 from his investments. Appellant testified that she spent about $6,000 a month on clothes alone. Respondent's attorney stipulated that respondent could pay any reasonable amount of spousal support.

Appellant testified that she did not wish to return to work as a dental hygienist because it was a stressful, "dead-end" job with no advancement, she had lost her contacts, she would be "rusty" if she went back, her license had expired and she would have to take a test to revive it, as well as "brush-up" courses. Additionally, according to literature on the subject, dental hygienists "burn-out" after about five years, which was the length of time respondent had been practicing before the marriage. She had prepared a resume and applied for several other jobs (public relations at a winery, part-time writer for the Independent Journal, record company, cellular telephone company, lobbyist firm) but had not been successful. She testified that she did not think she was ready to go to work immediately because she had been through a lot, had not worked in a long time, and wanted to see what her options were and make the right choice before entering something new.

Appellant presented three expert witnesses who testified that she was not emotionally prepared to immediately begin self-supporting employment. Dr. Diane McEwen, a psychiatrist, had evaluated appellant over the course of 13 therapy hours starting in June 1990. She found appellant to be depressed, preoccupied with memories of a very painful marriage and her inability to cope with them, detached and estranged from other people, afraid she would not be able to regain the state of good mental health she had enjoyed before the marriage, and complaining of physical symptoms which occurred during the marriage, some of which had improved since separation, including sleep disturbances, daily diarrhea, sudden nosebleeds and marked weight changes. McEwen concluded that appellant was suffering from a posttraumatic stress disorder and believed appellant needed to gradually develop a new career, beginning with working for people she knew in supportive settings. She reached her diagnosis after one appointment with appellant, and without consulting the psychiatrist and psychologist who had previously treated appellant.

Dr. Sheryl Hauseman, a clinical psychologist, evaluated appellant based on a clinical interview and administration of psychological tests in April and May, 1990, and review of prior psychological test results. She also concluded appellant was suffering from a posttraumatic stress disorder caused by the chronic tension and fear that she felt in the marriage and by the physical and emotional abuse she suffered. Hauseman testified that appellant was in extreme distress and unable to function adequately in the world.

Dr. Joan Kelly, a psychologist, saw appellant for psychotherapy 13 times between April 13 and December 18, 1989. She concluded appellant had a severe reactive depression engendered during the marriage and exacerbated after the separation. Kelly thought appellant was too depressed to be able to

function in a job; she initially felt appellant would be able to become self-supporting in one or two years, but when no progress had been made by December felt it would still take another year or two years.

Respondent offered two expert witnesses to refute appellant's evidence. Dr. Gerald Hill had been appellant's psychiatrist from June 1986 until March 1989, having seen her for approximately 300 sessions. Hill disagreed with the diagnosis of posttraumatic stress syndrome. About three months after he began seeing appellant, Hill diagnosed her as having a mixed personality disorder with narcissistic, major hysterical and occasional borderline dimensions; he testified that personality disorders by definition form in childhood and that the marriage "crystallized" appellant's disorder. Hill testified that successful treatment of appellant's personality disorder could take from six months to five years. He was not able to say whether appellant would be employable.

Finally, Dr. James Stubblebine, another psychiatrist, evaluated appellant in connection with this action. Stubblebine also disagreed with the diagnosis of posttraumatic stress disorder. He thought she probably had a "significant depression" during the marriage; while at his deposition he did not think appellant had a personality disorder, Stubblebine had since received information which led him to accept Hill's diagnosis, although Stubblebine felt the disorder was mild. The personality disorder would not preclude appellant from being employed and Stubblebine felt she was capable of being employed if she wished to be.

## DISCUSSION

### I.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### II.

Appellant next contends the trial court erroneously read a "community income-community property concept" into Civil Code section 4801.[2] This statute authorizes trial courts to order spousal support "for any period of time, as the court may deem just and reasonable, based on the standard of living established during the marriage." (§ 4801, subd. (a).) In making its award, the trial court is required to consider nine enumerated factors, several of which explicitly refer to the marital standard of living, as well as any

---

*See footnote, *ante*, page 1513.

[2]All further statutory references will be to the Civil Code unless otherwise specified.

others it deems "just and equitable." (*Ibid.*)[3] The trial court is required to "make specific factual findings with respect to the standard of living during the marriage, and, at the request of either party, the court shall make appropriate factual determinations with respect to any other circumstances." (*Ibid.*)

In the present case, the court commenced its statement of decision by reference to the factors enumerated in section 4801, its most significant findings being that appellant had a marketable skill she could make use of with little retraining and was young and healthy, that respondent was very wealthy and had not worked during the marriage, and that the marriage was brief and there were no children.[4] With respect to the question of standard of living, the court made specific reference to respondent's Tiburon home,

---

[3]The factors the trial court is required to consider under section 4801, subdivision (a), are as follows:

"(1) The extent to which the earning capacity of each spouse is sufficient to maintain the standard of living established during the marriage, taking into account all of the following:

"(A) The marketable skills of the supported spouse; the job market for those skills; the time and expenses required for the supported spouse to acquire the appropriate education or training to develop those skills; and the possible need for retraining or education to acquire other, more marketable skills or employment.

"(B) The extent to which the supported spouse's present or future earning capacity is impaired by periods of unemployment that were incurred during the marriage to permit the supported spouse to devote time to domestic duties.

"(2) The extent to which the supported spouse contributed to the attainment of an education, training, a career position, or a license by the other spouse.

"(3) The ability to pay of the supporting spouse, taking into account the supporting spouse's earning capacity, earned and unearned income, assets, and standard of living.

"(4) The needs of each party based on the standard of living established during the marriage.

"(5) The obligations and assets, including the separate property, of each.

"(6) The duration of the marriage.

"(7) The ability of the supported spouse to engage in gainful employment without interfering with the interests of dependent children in the custody of the spouse.

"(8) The age and health of the parties.

"(9) The immediate and specific tax consequences to each party.

"(10) Any other factors which it deems just and equitable."

[4]The court found appellant had the marketable skill of dental hygienist, for which there was a market within reasonable commuting distance, it would take less than two or three months for appellant to "get up to speed," with no substantial retraining or education required to market her skill, and appellant's period of unemployment had little effect on her current employability and income (§ 4801, subd. (a)(1)(A) and (a)(1)(B)); issues concerning the supported spouse's contribution to the other spouse's attainment of education or career were irrelevant (§ 4801, subd. (a)(2)); respondent had earning capacity, had not worked during the marriage but had assets creating income at a "substantial standard of living" and meeting his needs adequately (§ 4801, subd. (a)(3) and (a)(4)); respondent had assets approximating $15 million which created an annual available cash flow of approximately $500,000, with fairly small obligations, while appellant "essentially has no assets," owning a vehicle, possibly a condominium in which she did not have much equity, $25,000 or $30,000 saved from the temporary support she had been receiving and something less than $25,000 in assets to be

Tahoe estate and cars, and found the marital lifestyle to be "affluent." The court then addressed the issue of appellant's health and ability to work, reviewing the testimony of each of the experts and concluding that appellant suffered from a personality disorder which was exacerbated by the parties' relationship but which was not adequately debilitating to prevent her from working.[5]

Finally, the court expressed its view that the standard of living factor was meant by the Legislature to reflect the common situation in which couples marry with little and over time jointly acquire assets and enjoy a higher standard of living. In that situation the nonworking spouse should not be financially prejudiced by divorce. The "same sociological considerations" do not necessarily apply in a marriage of short duration, the court explained, where neither party worked, one was very wealthy and the standard of living derived from inherited money rather than the efforts of either spouse.[6] The court concluded: "In any event, when analyzing the length of the marriage, the life style, the assets of the parties, the marketable skills of [appellant],

---

determined when the community property was divided (§ 4801, subd. (a)(5)); the marriage lasted three years and seven months (§ 4801, subd. (a)(6)); there were no children (§ 4801, subd. (a)(7)); respondent's age and health were irrelevant and respondent was of good physical health and in her early to midthirties (§ 4801, subd. (a)(8)); and tax consequences were "of little meaning" in the case (§ 4801, subd. (a)(9)).

[5]The court rejected the testimony of appellant's experts, finding Dr. McEwen's opinion of no value based on her testimony as to how she arrived at her opinion, Dr. Hauseman's testimony "inherently incredible and unprofessional," and Dr. Hill's opinion "the most valued opinion." It also expressed the view, based on the court's experience, that the five experts "would find that everyone in this courtroom has a personality disorder of some kind or another."

[6]The court stated: "It is this Court's interpretation of the standard of living, length of marriage relationship, that is was the legislature's intent that—and I think the cases support this, that sociologically, at least, most marriages commence when parties are relatively young. They may have some assets, but generally they do not.

"And as time passes, they acquire assets and they acquire a life style, and it is in part a joint acquisition of assets and life style.

"And of course, as the marriage extends on, hopefully the lifestyle becomes greater and the assets become greater. And the legislature, I believe, is suggesting to the Court that it should consider that kind of society setting, if you will, of matrimony and joint effort, and that when one spouse has been the earning spouse, supported the other and the community into a good standard of living, that it's unfair at the dissolution to cut the non-working spouse off, and that one should consider the life style of the standard of living of the community as it became during the course of the marriage.

"And this Court sees the reasonableness and the justification for that. I am not sure the same sociological considerations apply or should apply when there is a short marriage, one party—neither party being employed, one party being very wealthy.

"And the non-working spouses run off in the sunset and have a great time based upon the time and effort of, not the community, not either spouse, but someone's great-great grandfather.

"In reading the proposition of the proponents to the amendment of 4801, that's what I think they are talking about."

the availability of her employment, the time in which it would take to get back into the work force and the reasonably full-time employed—that's something she doesn't want to do, but she clearly has the ability to do it—constrains me to make the following orders with regards to spousal support."

■ Appellant contends that section 4801 does not limit consideration of marital standard of living to situations where the standard of living results from community efforts but requires it to be considered as the starting point in all cases. The trial court's comments, however, make clear that the standard of living *was* considered in determining the spousal support award. The judge simply recognized that the situation of a spouse ending a brief marriage in which the standard of living was determined by the other spouse's separate property assets is different from that of a spouse ending a long-term marriage in which the couple developed a standard of living together. "The marital standard is just one factor to be weighed with all other applicable factors to reach a 'just and reasonable' result." (*In re Marriage of Smith* (1990) 225 Cal.App.3d 469, 490 [274 Cal.Rptr. 911].) Here, the court properly also considered the duration of the marriage and appellant's ability to become self-supporting in reaching its decision.

## III.

■ Appellant also contends generally that the trial court abused its discretion in awarding her spousal support of $5,000 a month for only six months. Specifically, she claims the court improperly rejected consideration of the marital standard of living, rejected the overwhelming expert testimony regarding appellant's psychological impairment, and overemphasized the short duration of the marriage.

"The trial court is bound to consider the guidelines contained in section 4801, subdivision (a), 'but the ultimate decision rests within the court's "broad discretion." ■ A trial court's exercise of discretion will not be disturbed on appeal unless, *as a matter of law*, an abuse of discretion is shown—i.e.,—where, considering all the relevant circumstances, the court has "exceeded the bounds of reason" or it can "fairly be said" that no judge would reasonably make the same order under the same circumstances. [Citations omitted.]' " (*In re Marriage of Smith, supra*, 225 Cal.App.3d 469, 479-480, quoting Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 1989) § 6:79, p. 6-96.14, italics in original.)

■ We have already discussed, and found unavailing, appellant's claim that the trial court failed to consider the marital standard of living. With

respect to the evidence regarding her psychological impairment, the trial court explained that it was rejecting the testimony of appellant's two experts who diagnosed her as suffering from a posttraumatic stress disorder because it found their testimony "inherently incredible and unbelievable." Of the remaining three experts, one testified that appellant was unable to function at a job in the period of April through December 1989 and that it could take a year or two from December 1989 for her to become self-supporting; one could not say whether she was presently employable; and one testified that she was capable of being employed if she wanted to be. The trial court was not obliged to accept the testimony of appellant's experts. (*Ortzman* v. *Van Der Waal* (1952) 114 Cal.App.2d 167, 170-171 [249 P.2d 846].)

As for the duration of the marriage, we cannot agree that the court unduly emphasized this factor. Rather, the court failed to rely primarily on the factors appellant thought most important, such as respondent's wealth and the marital standard of living, and considered all the pertinent factors— duration of the marriage, standard of living, respondent's inherited wealth, and appellant's age, health and employability. The only case appellant cites to support her contention that the award was an abuse of discretion is *In re Marriage of Hopkins* (1977) 74 Cal.App.3d 591 [141 Cal.Rptr. 597]. That case reversed an order for three years of spousal support in the amount of $300 per month where the 62-year-old husband's net income was $1,465 a month and the 60-year-old wife's prospects of finding employment were "virtually nonexistent." The appellate court applied the rule that after a lengthy marriage, retention of jurisdiction to modify spousal support should be the norm, with the burden of proof of justification for termination on the party seeking termination. (*Id.*, at pp. 596-597.) The present case, involving a three-year-and-seven-month marriage and thirty-three-year-old wife who had been out of the work force for five years, bears no similarity; in contrast to the rule relied upon in *Hopkins*, support after a short-term marriage is usually short-term, with a fixed termination date. (*In re Marriage of Prietsch & Calhoun* (1987) 190 Cal.App.3d 645, 663 [235 Cal.Rptr. 587].) In arguing the insufficiency of a six-month order here, appellant conveniently ignores the fact that at the time of trial she had received temporary support of $7,500 a month for eighteen months. Her total support thus extended for a period of two years. We cannot find this award an abuse of discretion.

### IV.

Appellant's final contention is that the trial court's denial of her request for attorney fees was an abuse of discretion. Appellant's attorney requested $48,440 for attorney fees and $10,472.43 for costs, a total award of $61,912.43, in addition to the $19,000 he had already received from respondent for attorney fees.

Section 4370 provides that the court in a dissolution action may order any party, except a governmental entity "to pay such amount as may be reasonably necessary for the cost of maintaining or defending the proceeding and for attorneys' fees . . . ."[7] ■ "The purpose of the award is to provide one of the parties, if necessary, with an amount adequate to properly litigate the controversy." (*In re Marriage of Sullivan* (1984) 37 Cal.3d 762, 768 [209 Cal.Rptr. 354, 691 P.2d 1020].) In making its determination, the trial court must take into consideration the respective needs and incomes of the parties, including evidence of income, assets and abilities. (*Ibid.; In re Marriage of Seaman & Menjou* (1991) 1 Cal.App.4th 1489, 1497 [2 Cal.Rptr.2d 690].) It may also consider various factors including " ' "the nature of the litigation, its difficulty, the amount involved, the skill required and the skill employed in handling the litigation, the attention given, the success of the attorney's efforts, his learning, his age, and his experience in the particular type of work demanded [citation]; the intricacies and importance of the litigation, the labor and the necessity for skilled legal training and ability in trying the cause, and the time consumed. [Citations.]" ' " (*In re Marriage of Fransen* (1983) 142 Cal.App.3d 419, 426 [190 Cal.Rptr. 885], quoting *Berry* v. *Chaplin* (1946) 74 Cal.App.2d 669, 679 [169 P.2d 453]; *In re Marriage of Lopez* (1974) 38 Cal.App.3d 93, 113 [113 Cal.Rptr. 58], disapproved on other grounds in *In re Marriage of Morrison* (1978) 20 Cal.3d 437, 453 [143 Cal.Rptr. 139, 573 P.2d 41].)

■ A motion for attorney fees in a marital dissolution action is left to the sound discretion of the trial court and will not be overturned absent an abuse of that discretion. (*In re Marriage of Sullivan, supra,* 37 Cal.3d at pp. 768-769; *In re Marriage of Seaman & Menjou, supra,* 1 Cal.App.4th at p. 1496; *In re Marriage of Fransen, supra,* 142 Cal.App.3d 419, 426.) " '[T]he trial court's order will be overturned only if, considering all the evidence viewed most favorably in support of its order, no judge could reasonably make the order made. [Citations.]' " (*In re Marriage of Sullivan, supra,* 37 Cal.3d at p. 769, quoting *In re Marriage of Cueva* (1978) 86 Cal.App.3d 290, 296 [149 Cal.Rptr. 918].)

In the present case, the trial court explained its reasons for denying attorney fees as follows:

[7]At the time of trial, section 4370 simply provided: "During the pendency of any proceeding under this part, the court may order any party, except a governmental entity, to pay such amount as may be reasonably necessary for the cost of maintaining or defending the proceeding and for attorneys' fees . . . ." The statute was amended in 1991 to provide: "During the pendency of any proceeding under this part, the court may order any party, and based upon (1) determining an ability to pay and (2) consideration of the respective incomes and needs of the parties in order to ensure that each party has access to legal representation to preserve all of his or her rights, except a governmental entity, to pay such amount as may be reasonably necessary for the cost of maintaining or defending the proceeding and for attorney's fees . . . ." (Stats. 1991, ch. 500, § 1.)

"Attorneys' fees. Attorneys' fees in this case, to establish a support order for a healthy lady, after three-and-a-half-year marriage, are outrageous, in my judgment, for both sides. [¶] The expenses for five professionals to evaluate everybody, to opine, to depose, to do what they did and testify here, is only as a consequence of the fact that Mr. Huntington has money. . . . I find this to be totally unreasonable in light of the length of the marriage and in light of the circumstances of the parties, what they had when they started the marriage and when they ended the marriage. [¶] This case, presented, should have cost no more than $10,000 for attorney's fees on each side, and maybe 5,000 or 6,000 in professional fees. [¶] But I sense that it has cost a great deal more, and the Declaration of [appellant's counsel] indicates that he believes he's worth $60,000 on this case, and I do not. I believe this case is a $10,000 attorney's fees case. [¶] And if you gentlemen had checked my record from Orange County, which is a relatively affluent county, you would have found that I pay substantial attorney's fees for substantial and important work, and I pay little, if any, attorney's fees for inconsequential inappropriate and unjustified work. [¶] Therefore, on attorney's fees and costs, each party shall bear their own fees and costs. This case should never have been here."

"When the trial court is informed of the extent and nature of the services rendered, it may rely on its own experience and knowledge in determining their reasonable value." (*In re Marriage of Cueva, supra*, 86 Cal.App.3d at p. 300, fn. omitted; see *In re Marriage of Ananeh-Firempong* (1990) 219 Cal.App.3d 272, 280 [268 Cal.Rptr. 83].) "The exercise of sound discretion by the trial court in the matter of attorney's fees includes also judicial evaluation of whether counsel's skill and effort were wisely devoted to the expeditious disposition of the case." (*In re Marriage of Lopez, supra*, 38 Cal.App.3d at p. 113.) *In re Marriage of Lopez* upheld an award of $5,000 rather than the $15,345.32 requested by the wife's attorney, based on the trial court's opinion that the wife " 'could have been well and properly represented' " with a fee of $5,000. (*Id.*, at pp. 112-113.)

Section 4370 allows for awards of fees "reasonably necessary" to maintain or defend an action. Here, the trial court made clear that it believed appellant's litigation of the case had been unreasonable. In view of the short duration of the marriage, absence of any issues regarding property, and complete rejection by the trial court of appellant's claimed disability, we cannot find this conclusion an abuse of discretion.[8]

Appellant's complaint that the court did not allow her attorney to present evidence regarding attorney fees is unavailing. Her contention that the case

---

[8]The cases upon which appellant relies in urging reversal bear no similarity to the present action. *In re Marriage of Fransen, supra*, 142 Cal.App.3d 419, 426-427, found an abuse of discretion where $11,855 was requested for attorney fees and the court awarded $1,500 in a

was overlitigated due to respondent's actions was presented to the trial court both at trial and in her motion for reconsideration.[9] The trial court was in a far better position than this court to assess the factual basis for appellant's assertions, and apparently found it lacking.[10] Appellant had already received considerably more in fees than the trial court considered the case worth; we find no basis for reversing the court's decision not to award her additional fees.

The judgment is affirmed.

Benson, J., and Peterson, J., concurred.

A petition for a rehearing was denied November 18, 1992.

---

case which spanned at least nine and a half years and which even the trial court called complex, involving division of a military pension and issues relating to a prior foreign judgment. *In re Marriage of Mulhern* (1973) 29 Cal.App.3d 988, 994 [106 Cal.Rptr. 78], found an award of $550 *excessive* for an uncomplicated petition for an order to show cause and hearing lasting considerably less than one day. *In re Marriage of Fenton* (1982) 134 Cal.App.3d 451 [184 Cal.Rptr. 597], found an award of $5,750 inadequate where the wife's actual costs were far higher in a complicated case involving property issues including valuation of a law practice and goodwill. *In re Marriage of Jacobs* (1982) 128 Cal.App.3d 273, 288-289 [180 Cal.Rptr. 234], found an abuse of discretion in the denial of any fees in a proceeding to set aside a judgment of dissolution on grounds of fraud and mistake. *In re Marriage of Hopkins, supra,* 74 Cal.App.3d 591, 600, reversed an order denying any fees to a wife without income in the dissolution of a thirty-four-year marriage involving contested property issues. *In re Marriage of Harrison* (1986) 179 Cal.App.3d 1216, 1231-1232 [225 Cal.Rptr. 234], found an award of $2,000 inadequate in light of the husband's ability, wife's need and difficulty and novelty of the issues, which included allocation of separate and community interests in stock option plans.

[9]At trial, appellant's attorney told the court that the case had been "much ado about very little," stating that respondent "could have given this lady three years' support, a little money to set her up in a condo, patted her on the head and said goodbye" but instead "for his own psychological reasons" had "chosen to make a big to-do about it" and that appellant should not be punished for his "psychological quirk." In his declaration in support of the motion to reconsider fees, appellant's counsel urged that the excessive time spent on the case was not his or appellant's fault, as respondent had insisted on reopening discovery to depose additional psychologists, while appellant's counsel would have proceeded with just Dr. McEwen and Dr. Stubblebine, and appellant's counsel spent far longer in depositions than respondent's counsel did or felt necessary.

[10]It may noted, for example, that the court allowed respondent to reopen discovery upon counsel's assertions that he had only learned in Dr. McEwen's deposition that she had reached her diagnosis if posttraumatic stress disorder after one hour with appellant and without contacting the psychiatrist and psychologist who had treated appellant during marriage and immediately after separation, and needed to depose these other experts in order to contest McEwen's credibility.